**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Case No.:**

GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO
GENERAL INSURANCE COMPANY, and
GEICO CASUALTY CO.,                                        **Jury Trial Demanded**

Plaintiffs,

vs.

FLORIDA SPINE AND JOINT INSTITUTE
LLC., TCFII SPINE LLC., DANNY FEDER,
D.C., SAMUEL HESS, M.D., MARK
BROCKELMAN, RYAN FULCHER, PETER
WARHEIT, M.D., STEVEN GREENBERG,
M.D., PEDRO JAVIER TORT-SAADE, M.D.,
ALBERTO RIVERA, M.D., KAREN AMAR,
D.C., JOHN CROCCO, P.A., ANTHONY
DANIELI, D.C., JENNIFER ENGLANDER,
D.C., BRIAN LAYTON, P.A., NELINDA
LOPEZ, D.C., HENRY SANON, D.C., and
MICHAEL WHITE, D.C.,

Defendants.
_____/

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for

their Complaint against the Defendants, hereby allege as follows:

1.      This action seeks to recover more than $2,000,000.00 that the Defendants

wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of

fraudulent no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through

Defendant Florida Spine and Joint Institute, LLC ("Florida Spine") relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care services, including initial examinations, follow-up examinations, physical therapy services, chiropractic services, and pain management injections (collectively the "Fraudulent Services"), that purportedly were provided to automobile accident victims ("Insureds") who were eligible for coverage under GEICO Florida no-fault insurance policies.

2.     In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending, fraudulent no-fault insurance claims that the Defendants have submitted or caused to be submitted through Florida Spine, because:

(i)     at all relevant times, Florida Spine and its related entities operated in violation of the licensing and operating requirements set forth in the Florida Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"), rendering them ineligible to collect no-fault insurance benefits in the first instance, and rendering their no-fault insurance charges noncompensable and unenforceable;

(ii)    the underlying Fraudulent Services were not medically necessary, were unlawful, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)   in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were performed – to the extent that they were performed at all – by unsupervised massage therapists, and Florida law prohibits no-fault insurance reimbursement for massage or for services performed by unsupervised massage therapists;

(iv)    in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were performed – to the extent that they were performed at all – by individuals who lacked the requisite licenses to perform the services without supervision;

(v)     in many cases, the Fraudulent Services never were provided in the first instance; and

(vi)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

3.       The Defendants fall into the following categories:

(i)      Defendant Florida Spine, through which the Fraudulent Services purportedly were provided and were billed to insurance companies, including GEICO, is a Florida limited liability company that owned and operated health care clinics throughout Florida in pervasive violation of the Clinic Act.

(ii)     Defendant TCFII Spine LLC ("TCFII") is a Delaware limited liability company that owned and controlled Florida Spine.

(iii)    Defendants Danny Feder ("Feder") and Samuel Hess M.D. ("Hess") owned and controlled TCFII, and used Florida Spine as a vehicle to submit fraudulent billing for the Fraudulent Services to GEICO and other insurers. Hess also falsely purported to serve as medical director at numerous Florida Spine clinics.

(iv)     Defendant Ryan Fulcher (Fulcher) is the chief executive officer of Florida Spine, and used Florida Spine as a vehicle to submit fraudulent billing for the Fraudulent Services to GEICO and other insurers.

(v)      Mark Brockelman ("Brockelman") is the chief financial officer of Florida Spine, and used Florida Spine as a vehicle to submit fraudulent billing for the Fraudulent Services to GEICO and other insurers.

(vi)     Defendants Peter Warheit, M.D. ("Warheit"), Hess, and Pedro Javier Tort-Saade, M.D. ("Tort-Saade") are physicians licensed to practice medicine in Florida, falsely purported to serve as the medical directors of numerous Florida Spine clinics, and purported to perform many of the Fraudulent Services that were billed through Florida Spine to GEICO and other insurers.

(vii)    Defendant Steven Greenberg, M.D. ("Greenberg") is a physician licensed to practice medicine in Florida, and falsely purported to serve as the medical director at numerous Florida Spine clinics.

(viii)   Defendant Alberto Rivera, M.D. ("Rivera") is a physician licensed to practice medicine in Florida, and purported to perform many of the Fraudulent Services that were billed through Florida Spine to GEICO and other insurers.

(ix)     Defendants Karen Amar, D.C. ("Amar"), Anthony Danieli, D.C. ("Danieli"), Jennifer Englander, D.C. ("Englander"), Nelinda Lopez, D.C. ("Lopez"), Henry Sanon, D.C. ("Sanon"), and Michael White, D.C. ("White") are chiropractors licensed to practice chiropractic in Florida, and purported to perform many of the

Fraudulent Services that were billed through Florida Spine to GEICO and other insurers.

(x)     Defendants John Crocco, P.A. ("Crocco") and Brian Layton, P.A. ("Layton") are licensed as physician assistants in Florida, and purported to perform many of the Fraudulent Services that were billed through Florida Spine to GEICO and other insurers.

4.     As set forth below, the Defendants at all relevant times have known that:

(i)     Florida Spine and its related entities were operated in violation of the licensing and operating requirements set forth in the Clinic Act, rendering them ineligible to collect no-fault insurance benefits in the first instance, and rendering their no-fault insurance charges noncompensable and unenforceable;

(ii)    the underlying Fraudulent Services were not medically necessary, were unlawful, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)   in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were performed – to the extent that they were performed at all – by unsupervised massage therapists, and Florida law prohibits no-fault insurance reimbursement for massage or for services performed by unsupervised massage therapists;

(iv)    in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were performed – to the extent that they were performed at all – by individuals who lacked the requisite licenses to perform the services without supervision;

(v)     in many cases, the Fraudulent Services never were provided in the first instance; and

(vi)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

5.     As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through Florida Spine.

6.     The chart annexed hereto as Exhibit "1" sets forth a large and representative sample of the fraudulent claims that have been identified to date that the Defendants have submitted, or

caused to be submitted, to GEICO.

7.     The Defendants' fraudulent scheme began no later than 2018 and has continued uninterrupted since that time. As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $2,000,000.00.

8.     Defendants' fraudulent scheme is the latest in a long line of insurance fraud scams aimed at Florida consumers and insurers.  They are part of an insurance fraud epidemic that – in 2014-2015 alone – led to almost 1,200 convictions in Florida.  See Florida Department of Financial Services, Division of Insurance Fraud Annual Report for Fiscal Year 2014-2015.

## THE PARTIES

### I.     Plaintiffs

9.     Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively, "GEICO") are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

### II.     Defendants

10.     Defendant Florida Spine is a Florida limited liability company with its principal place of business in Coral Springs, Florida.

11.     Florida Spine was organized by Feder and Hess in Florida on or about February 12, 2013.

12.     In 2018, a collection of fourteen separate entities owned by Feder, and in one instance by Feder and Hess, which separately operated numerous Florida health care practices (collectively the "Feder/Hess Entities"), merged into Florida Spine, leaving Florida Spine as the surviving entity with Feder and Hess as its owners.

13.     The Feder/Hess Entities that merged into Florida Spine included the following fourteen entities:

(i)      South Florida Pain & Rehabilitation, PA;

(ii)     South Florida Pain and Rehabilitation of West Broward, Inc.;

(iii)    West Hollywood Pain & Rehabilitation, Inc.;

(iv)     Margate Pain & Rehabilitation, Inc.;

(v)      Pompano Beach Pain & Rehabilitation, Inc.;

(vi)     South Florida Pain & Rehabilitation Center, Corp.;

(vii)    South Florida Pain & Rehab of Lake Worth, LLC;

(viii)   South Florida Pain & Rehabilitation of Hialeah, LLC;

(ix)     Florida Spine and Joint Institute of Orlando, LLC;

(x)      Select Health Care, LLC;

(xi)     Global Health & Rehabilitation, LLC;

(xii)    South Florida Pain and Rehabilitation of West Dade, Inc.;

(xiii)   Premier Diagnostic Centers, LLC; and

(xiv)    South Florida Patient Transportation, LLC.

14.     In 2018, once the Feder/Hess Entities merged into Florida Spine, TCFII acquired Florida Spine.

15.     Since at least 2018, Florida Spine has operated at least fifteen Florida health care clinics in pervasive violation of the Clinic Act, including clinics at the following locations:

(i)      Florida Spine-Coral Springs – 1725 N University Drive, Coral Springs, Florida 33071;

(ii)     Florida Spine-Delray – 3333 S Congress Avenue, Delray Beach, Florida, 33445;

(iii)    Florida Spine-Fort Myers – 6300 Corporate Court, Fort Myers, Florida, 33919;

(iv)     Florida Spine-Hialeah – 7975 NW 154th Street, Miami Lakes, Florida, 33016;

(v)      Florida Spine-Kendall – 8501 SW 124h Avenue, Miami, Florida, 33183;

(vi)     Florida Spine-Lake Worth – 1926 10th Avenue N, Lake Worth, Florida, 33183;

(vii)    Florida Spine-Margate – 1103 Banks Road, Margate, Florida, 33063;

(viii)   Florida Spine-North Miami – 18441 NW 2nd Avenue, Miami Gardens, Florida, 33169;

(ix)     Florida Spine-Orlando – 1300 N Semoran Blvd, Florida 33169; Orlando, Florida, 32807;

(x)      Florida Spine-Pompano – 1600 S Federal HWY; Pompano Beach, Florida, 33062;

(xi)     Florida Spine-West Broward – 6738 W Sunrise Blvd, Plantation, Florida 33313;

(xii)    Florida Spine-West Dade – 5040 NW 7th St, Miami, Florida 33126;

(xiii)   Florida Spine-West Hollywood – 6030 Hollywood Blvd, Hollywood, Florida 33021;

(xiv)    Florida Spine-West Palm Beach – 5601 Corporate Way, West Palm Beach, Florida 33407; and

(xv)     Florida Spine-Premier – 8181 NW 36th Street, Doral Florida 33166.

16.     Defendant TCFII is a Delaware limited liability company that is authorized to do business in Florida. TCFII was organized in Delaware on or about April 17, 2018, was owned and controlled by Feder and Hess, and – in turn – owned Florida Spine.

17.     Defendant Feder resides in and is a citizen of Florida. Feder owned and controlled TCFII and Florida Spine, and used Florida Spine as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers. Feder was licensed to practice chiropractic in Florida on January 12, 2001.

18.     Defendant Hess resides in and is a citizen of Florida. Hess owned and controlled TCFII and Florida Spine, and used Florida Spine as a vehicle to submit fraudulent no-fault

insurance billing to GEICO and other insurers.  Hess was licensed to practice medicine in Florida on August 1, 2005, purported to perform Fraudulent Services on behalf of Florida Spine, and falsely purported to serve as "medical director" at numerous Florida Spine clinics, including Florida Spine-Delray, Florida Spine-Lake Worth, Florida Spine-Orlando, and Florida Spine-West Palm Beach.

19.     Defendant Fulcher resides in and is a citizen of Florida. Fulcher purported to be the chief executive officer of Florida Spine, participated in the operation and management of Florida Spine, and used Florida Spine as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

20.     Defendant Brockelman resides in and is a citizen of Florida. Brockelman purported to be the chief financial officer of Florida Spine, participated in the operation and management of Florida Spine, and used Florida Spine as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

21.     Defendant Warheit resides in and is a citizen of Florida.

22.     Warheit was licensed to practice medicine in Florida on or about April 15, 1988.

23.     Warheit falsely purported to serve as "medical director" at numerous Florida Spine clinics, including Florida Spine-Coral Springs, Florida Spine-Margate, Florida Spine-Pompano, Florida Spine-West Broward, and Florida Spine-West Hollywood, and purported to perform many of the Fraudulent Services on behalf of Florida Spine.

24.     Defendant Greenberg resides in and is a citizen of Florida.

25.     Greenberg was licensed to practice medicine in Florida on or about June 25, 1997.

26.     Greenberg falsely purported to serve as "medical director" at numerous Florida Spine clinics, including Florida Spine-Fort Myers, Florida Spine-Premier, and Florida Spine-Kendall.

27.     Defendant Tort-Saade resides in and is a citizen of Florida.

28.     Tort-Saade was licensed to practice medicine in Florida on or about October 22, 2008.

29.     Tort-Saade falsely purported to serve as "medical director" at numerous Florida Spine clinics, including Florida Spine-Hialeah, Florida Spine-North Miami, and Florida Spine-West Dade, and purported to perform many of the Fraudulent Services on behalf of Florida Spine.

30.     Defendant Rivera resides in and is a citizen of Florida. Rivera was licensed to practice medicine in Florida on August 14, 2015, and purported to perform many of the Fraudulent Services on behalf of Florida Spine.

31.     Defendant Amar resides in and is a citizen of Florida. Amar was licensed to practice chiropractic in Florida on February 2, 1993, and purported to perform many of the Fraudulent Services on behalf of Florida Spine.

32.     Defendant Crocco resides in and is a citizen of Florida. Crocco was licensed as a physician assistant in Florida on December 14, 2015, and purported to perform many of the Fraudulent Services on behalf of Florida Spine.

33.     Defendant Danieli resides in and is a citizen of Florida. Danieli was licensed to practice chiropractic in Florida on December 2, 2008, and purported to perform many of the Fraudulent Services on behalf of Florida Spine.

34.     Defendant Englander resides in and is a citizen of Florida. Englander was licensed to practice chiropractic in Florida on October 14, 2003, and purported to perform many of the Fraudulent Services on behalf of Florida Spine.

35.     Defendant Layton resides in and is a citizen of Florida. Layton was licensed as a physician assistant in Florida on October 19, 2017, and purported to perform many of the Fraudulent Services on behalf of Florida Spine.

36.     Defendant Lopez resides in and is a citizen of Florida. Lopez was licensed to practice chiropractic in Florida on December 8, 2008, and purported to perform many of the Fraudulent Services on behalf of Florida Spine.

37.     Defendant Sanon resides in and is a citizen of Florida. Sanon was licensed to practice chiropractic in Florida on June 6, 1998, and purported to perform many of the Fraudulent Services on behalf of Florida Spine.

38.     Defendant White resides in and is a citizen of Florida. White was licensed to practice chiropractic in Florida on June 20, 2005, and purported to perform many of the Fraudulent Services on behalf of Florida Spine.

## JURISDICTION AND VENUE

39.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

40.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

41.     In addition, this Court has supplemental jurisdiction over the subject matter of the

claims asserted in this action pursuant to 28 U.S.C. § 1367.

42.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Florida is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

**ALLEGATIONS COMMON TO ALL CLAIMS**

**I.     An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement**

**A.     The Florida No-Fault Law**

43.     Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Florida Motor Vehicle No-Fault Law (the "No-Fault Law", Fla. Stat. §§ 627.730-627.7405), which requires automobile insurers to provide Personal Injury Protection benefits ("PIP Benefits") to Insureds.

44.     Under the No Fault Law, an Insured can assign his or her right to PIP Benefits to health care services providers in exchange for those services. See Fla. Stat. § 627.736. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health care Financing Administration insurance claim form (known as the "HCFA-1500 form"). See id.

**B.     No-Fault Reimbursement and Compliance with Florida Law Governing Health care Practice**

45.     In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

46.     Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

47.     Thus, health care services providers, including clinics licensed under the Clinic Act, may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

48.     By extension, insurers such as GEICO are not required to make any payments of PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

## C.      No-Fault Reimbursement and the Clinic Act

49.     Subject to certain limited exceptions that are not applicable in this case, the Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider." See Fla. Stat. § 400.9905.

50.     Pursuant to the Clinic Act, clinics operating in Florida must – among other things – "appoint a medical director or clinic director who shall agree in writing to accept legal responsibility for [certain enumerated] activities on behalf of the clinic." See Fla. Stat. § 400.9935(1).

51.     Among other things, a clinic medical director must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an

unlawful charge, the medical director or clinic director shall take immediate corrective action." See Fla. Stat. § 400.9935(1).

52.     In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license", and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

53.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014." See Fla. Stat. § 400.9935(3).

54.     Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's medical director or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

55.     By extension, insurers such as GEICO are not required to make any payments of PIP Benefits to clinics that operate in violation of the Clinic Act's medical director or other requirements, whether or not the underlying health care services were medically necessary or actually provided.

**D.    No-Fault Reimbursement and Medical Necessity**

56.    Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for medically necessary services. See Fla. Stat. § 627.736. Concomitantly, a health care services provider, including a clinic organized under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services. Id.

57.    Pursuant to the No-Fault Law, "medically necessary" means:

a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

(a) In accordance with generally accepted standards of medical practice;

(b) Clinically appropriate in terms of type, frequency, extent, site, and duration; and

(c) Not primarily for the convenience of the patient, physician, or other health care provider.

See Fla. Stat. § 627.732.

**E.    No-Fault Reimbursement, Massage Therapy, and Massage Therapists**

58.    Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics organized under the Clinic Act, to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

59.    However, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for services performed by massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5)("Medical benefits [that are reimbursable under the No-Fault Law] do not include massage …, regardless of the person, entity, or licensee providing

massage …, and a licensed massage therapist … may not be reimbursed for medical benefits under this section.").

60.     The No-Fault Law was amended to prohibit PIP reimbursement for massage or for services performed by massage therapists in response to widespread PIP fraud involving massage services and massage therapists. See, e.g., Florida House of Representatives Staff Analysis for House Bill 119 (amending the No-Fault Law), noting that "PIP fraud remains rampant", and citing dramatic increases in PIP claims for massage therapy as a significant part of the problem.

61.     Pursuant to Fla. Stat. § 486.028, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy.

**F.     No-Fault Billing and No-Fault Reimbursement**

62.     Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i)     For any service or treatment that was not lawful at the time rendered;

(ii)    For any service or treatment that is "upcoded", meaning that it is billed using a billing code that would result in payment greater in amount than would be paid using a billing code that accurately describes the services performed;

(iii)   To any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iv)    With respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

See Fla. Stat. § 627.736.

63.     The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, as well as the

guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes. See Fla. Stat. § 627.736.

## II.     The Defendants' Fraudulent Scheme

64.     Beginning no later than 2018, and continuing through the present day, the Defendants masterminded and implemented a massive fraudulent scheme in which they billed GEICO millions of dollars, or caused GEICO to be billed millions of dollars, for unlawful, medically unnecessary, illusory, and otherwise non-reimbursable services.

## A.     The Origins, Corporate Structure, and Ownership of the Florida Spine Clinics

65.      Between 2001 and 2014, Feder established a chain of chiropractic and pain management practices that purported to specialize in treating automobile accident victims.  By 2014, Feder owned and/or controlled approximately fourteen chiropractic offices in Florida, which he operated as separate business entities under a variety of different corporate names.

66.     Hess, together with Feder, also purported to own and/or control one of the fourteen chiropractic offices, specifically Florida Spine and Joint Institute of Orlando, LLC.

67.     In February 2013, Feder and Hess organized Florida Spine.

68.     In 2018, Feder and Hess sought to consolidate their large number of chiropractic and pain management offices in Florida (i.e., the Feder/Hess Entities) within a single corporate structure.

69.     Toward that end, in 2018, Feder and Hess merged the aforementioned fourteen Feder/Hess Entities into Florida Spine, with Florida Spine as the surviving entity.

70.     Prior to the merger and change in ownership structure, the Feder/Hess Entities operated pursuant to the "wholly owned" exemption under the Clinic Act. See § 400.9905(4)(g).

71.     However, when each of the Feder/Hess Entities that Feder and Hess owned and/or

controlled was merged into Florida Spine, Feder, Hess, and Florida Spine applied for health care clinic licenses since the change in ownership caused Florida Spine to no longer qualify for the "wholly owned" exemption.

72.     Consequently, in 2018, the Florida Spine clinics became licensed as health care clinics, which is also when Warheit, Greenberg, Hess, and Tort-Saade's tenure as the purported medical directors at the Florida Spine clinics began.

73.     Each of the fifteen licensed clinics contained the name of the city in which it was located in its clinic name. For example, the clinic located in Coral Springs became known as "Florida Spine and Joint Institute of Coral Springs". The clinic located in Margate became known as "Florida Spine and Joint Institute of Margate", and so forth.

74.     Shortly before the merger, in 2018, Feder organized TCFII in Florida.

75.     Then, in 2018, Feder and Hess transferred their direct ownership of Florida Spine to TCFII.

76.     However, Feder and Hess continued to own and control Florida Spine, via their ownership of TCFII.

**B.     The Violations of the Clinic Act**

77.     Because the Florida Spine clinics were subject to the Clinic Act, Florida Spine, TCFII, Feder, Hess, Fulcher, and Brockelman could not lawfully operate the Florida Spine clinics, or use the Florida Spine clinics as vehicles to submit PIP billing to GEICO and other insurers, unless they recruited and retained licensed physicians to serve as the Florida Spine clinics' medical directors. See Fla. Stat. §§ 400.9905, 440.9935.

78.     However, if Florida Spine, TCFII, Feder, Hess, Fulcher, and Brockelman retained legitimate physicians to serve as legitimate medical directors at the Florida Spine clinics, the

physicians actually would be obligated to fulfill the statutory requirements applicable to clinic medical directors. See, e.g., Fla. Stat. § 400.9935(1). By extension, any such legitimate medical directors would impede Florida Spine, TCFII, Feder, Hess, Fulcher, and Brockelman's ability to use the Florida Spine clinics as vehicles to submit a large amount of fraudulent PIP billing to GEICO and other Florida automobile insurers.

79.     Accordingly, Florida Spine, TCFII, Feder, Hess, Fulcher, and Brockelman required pliable physicians willing to falsely pose as the "medical directors" at the Florida Spine clinics, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to clinic medical directors, and thereby would permit Florida Spine, TCFII, Feder, Hess, Fulcher, and Brockelman to use the Florida Spine clinics as vehicles to submit a large amount of fraudulent PIP billing to GEICO and other insurers.

**1.     Warheit's Service as the Phony Medical Director at Florida Spine-Coral Springs, Florida Spine-Margate, Florida Spine-Pompano, Florida Spine-West Broward, and Florida Spine-West Hollywood**

80.     Toward that end, after consolidating Feder and Hess's existing network of chiropractic and pain management offices into Florida Spine, Florida Spine, TCFII, Feder, Hess, Fulcher, and Brockelman retained Warheit, a licensed physician who was willing to falsely pose as the legitimate medical director at the Florida Spine clinics known as Florida Spine-Coral Springs, Florida Spine-Margate, Florida Spine-Pompano, Florida Spine-West Broward, and Florida Spine-West Hollywood (collectively the "Warheit Clinics").

81.     In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to grant and maintain Florida Spine's licensure and to permit Florida Spine to operate the Warheit Clinics, Florida Spine, TCFII, Feder, Hess, Fulcher, and Brockelman entered into a secret scheme with Warheit.

82.     Specifically, in exchange for compensation from Florida Spine, TCFII, Feder, Hess, Fulcher, and Brockelman, Warheit agreed to falsely represent, to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at Florida Spine, and to the insurers including GEICO that received PIP claims from Florida Spine, that Warheit was the true medical director at the five Warheit Clinics, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at those clinics.

83.     In fact, Warheit never legitimately served as medical director at the Warheit Clinics inasmuch as he never conducted systematic reviews of the billing from those clinics to ensure that the billing was not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through those clinics, much less take any immediate corrective action. See Fla. Stat. § 400.9935(1).

84.     Indeed, given the fraudulent treatment and billing protocol described below – which was pervasive across the billing submitted to GEICO through the Warheit Clinics – there is simply no way that Warheit could have legitimately conducted systematic reviews of the billing from those clinics to ensure that the billing was not fraudulent or unlawful.

85.     Warheit – who was in his mid to late-60s at the time – could not possibly have legitimately fulfilled his statutory duty to conduct systematic reviews of the massive amount of billing submitted to GEICO through the Warheit Clinics.

86.     For example, between 2018 and the present, thousands of individual bills, containing tens of thousands of discrete charges, were submitted to GEICO through the Warheit Clinics.

87.     What is more, GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

88.     It is extremely improbable, to the point of impossibility, that the Defendants only submitted fraudulent billing to GEICO through the Warheit Clinics and that the Defendants did not simultaneously bill other automobile insurers through those clinics.

89.     Accordingly, upon information and belief, the thousands of individual bills and tens of thousands of individual charges submitted to GEICO that Warheit falsely purported to "systematically review" at the Warheit Clinics constituted only a fraction of the total number of bills that Warheit falsely purported to "systematically review" during his phony tenure as "medical director" at those clinics.

90.     Not even a legitimate physician in the prime of his or her life could have "systematically reviewed" the massive amount of billing generated by the Warheit Clinics.

91.     What is more, even as Warheit was falsely purporting to serve as "medical director" at the five separate Warheit Clinics, he also was simultaneously purporting to personally perform – or at least directly supervise – a massive amount of health care services that were billed to GEICO.

92.     For example, between November 2018 and the present alone, Warheit purported to personally perform – or at least directly supervise – more than $785,000.00 worth of purported health care services that were billed to GEICO through various Florida Spine clinics.

93.     It is improbable, to the point of impossibility, that Warheit actually could have fulfilled his statutory duty as medical director at the five separate Warheit Clinics, while simultaneously purporting to personally perform – or at least directly supervise – such a large number of discrete health care services.

94.     Furthermore – and as set forth above – GEICO is only one of the many insurance companies in the Florida automobile insurance market.

95.     Accordingly, the large number of discrete health care services that Warheit purported to personally perform or directly supervise during the period when he also was purporting to serve as medical director at the five separate Warheit Clinics constituted only a fraction of the total number of discrete health care services that Warheit purported to personally perform or directly supervise during the period when he also was purporting to serve as medical director at those clinics.

96.     Florida Spine, TCFII, Feder, Hess, Fulcher, and Brockelman used the façade of Warheit's phony "appointment" as the ersatz "medical director" at the Warheit Clinics to do indirectly what they were forbidden from doing directly – namely: (i) to operate those clinics without a legitimate medical director; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at those clinics; (iii) to permit health care services to be provided at Florida Spine by individuals who lacked the proper licensure to perform the services; and (iv) to use those clinics as vehicles to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

97.     Warheit unlawfully permitted Florida Spine, TCFII, Feder, Hess, Fulcher, and Brockelman to dictate the manner in which Insureds would be treated at the Warheit Clinics, and to dictate every aspect of the manner in which health care services at those clinics would be billed to GEICO and other insurers, because he sought to continue profiting from the Defendants' fraudulent scheme.

**2.     Greenberg's Service as the Phony Medical Director at Florida Spine-Fort Myers, Florida Spine-Kendall, and Florida Spine-Premier**

98.     Similarly, after consolidating Feder and Hess's existing network of chiropractic and pain management offices, Florida Spine, TCFII, Feder, Hess, Fulcher, and Brockelman retained Greenberg, a licensed physician who was willing to falsely pose as the legitimate medical director

at the Florida Spine clinics known as Florida Spine-Fort Myers, Florida Spine-Kendall, and Florida Spine-Premier (collectively the "Greenberg Clinics").

99.    In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to grant maintain Florida Spine's licensure and to permit Florida Spine to operate the Greenberg Clinics, Florida Spine, TCFII, Feder, Hess, Fulcher, and Brockelman entered into a secret scheme with Greenberg.

100.    Specifically, in exchange for compensation from Florida Spine, TCFII, Feder, Hess, Fulcher, and Brockelman, Greenberg agreed to falsely represent, to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at Florida Spine, and to the insurers including GEICO that received PIP claims from Florida Spine, that he was the true medical director at the Greenberg Clinics, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at those clinics.

101.    In fact, Greenberg never legitimately served as medical director at the Greenberg Clinics, inasmuch as he never conducted systematic reviews of the billing from those clinics to ensure that the billing was not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through those clinics, much less take any immediate corrective action. See Fla. Stat. § 400.9935(1).

102.    Indeed, given the fraudulent treatment and billing protocol described below – which was pervasive across the billing submitted to GEICO through the Greenberg Clinics – there is simply no way that Greenberg could have legitimately conducted systematic reviews of the billing from those clinics to ensure that the billing was not fraudulent or unlawful.

103.    Furthermore, between November 2018 and the present, thousands of individual bills, containing thousands of discrete charges, were submitted to GEICO through the Greenberg Clinics.

104.    As set forth above, GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

105.    It is extremely improbable, to the point of impossibility, that the Defendants only submitted fraudulent billing to GEICO through the Greenberg Clinics, and that the Defendants did not simultaneously bill other automobile insurers through those clinics.

106.    Accordingly, upon information and belief, the thousands of individual bills and thousands of individual charges submitted to GEICO that Greenberg falsely purported to "systematically review" at the Greenberg Clinics constituted only a fraction of the total number of bills that Greenberg falsely purported to "systematically review" during his phony tenure as "medical director" at those clinics.

107.    Greenberg did not, and could not have, "systematically reviewed" the massive amount of billing generated by the Greenberg Clinics.

108.    Moreover, even as Greenberg was falsely purporting to serve as "medical director" at the Greenberg Clinics, he also was simultaneously purporting to personally perform – or at least directly supervise – a massive amount of health care services that were billed to GEICO through his own personal medical practice, Steven Greenberg, M.D., P.A. ("Greenberg P.A.").

109.    For example, between November 2018 and the present alone, Greenberg purported to personally perform – or at least directly supervise – more than $430,000.00 worth of purported health care services that were billed to GEICO through Greenberg P.A.

110.     It is improbable, to the point of impossibility, that Greenberg actually could have fulfilled his statutory duty as medical director at the Greenberg Clinics, while simultaneously purporting to personally perform – or at least directly supervise – such a large number of discrete health care services.

111.     What is more – and as set forth above – GEICO is only one of the many insurance companies in the Florida automobile insurance market.

112.     Accordingly, the massive number of discrete health care services that Greenberg purported to personally perform or directly supervise during the period when he also was purporting to serve as medical director at the Greenberg Clinics constituted only a fraction of the total number of discrete health care services that Greenberg purported to personally perform or directly supervise during the period when he also was purporting to serve as medical director at those clinics.

113.     Florida Spine, TCFII, Feder, Hess, Fulcher, and Brockelman used the façade of Greenberg's phony "appointment" as the ersatz "medical director" at the Greenberg Clinics to do indirectly what they were forbidden from doing directly – namely: (i) to operate those clinics without a legitimate medical director; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at those clinics; (iii) to permit health care services to be provided at Florida Spine by individuals who lacked the proper licensure to perform the services; and (iv) to use those clinics as vehicles to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

114.     Greenberg unlawfully permitted Florida Spine, TCFII, Feder, Hess, Fulcher, and Brockelman to dictate the manner in which Insureds would be treated at the Greenberg Clinics, and to dictate every aspect of the manner in which health care services at those clinics would be

billed to GEICO and other insurers, because he sought to continue profiting from the Defendants' fraudulent scheme.

3.    **Hess's Service as the Phony Medical Director at Florida Spine-Delray, Florida Spine-Lake Worth, Florida Spine-Orlando, and Florida Spine-West Palm Beach**

115.    After the consolidation of Feder and Hess's existing network of chiropractic and pain management offices, Florida Spine, TCFII, Feder, Fulcher, Brockelman, and Hess designated Hess, a licensed physician, and an owner of Florida Spine, to falsely pose as the legitimate medical director at the Florida Spine clinics known as Florida Spine-Delray, Florida Spine-Lake Worth, Florida Spine-Orlando, and Florida Spine-West Palm Beach (collectively the "Hess Clinics").

116.    In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to maintain Florida Spine's licensure and to permit Florida Spine to operate the Hess Clinics, Florida Spine, TCFII, Feder, Fulcher, Hess, and Brockelman designated Hess to purportedly serve as medical director at the Hess Clinics.

117.    Specifically, Florida Spine, TCFII, Feder, Fulcher, Brockelman, and Hess agreed to falsely represent, to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at Florida Spine, and to the insurers including GEICO that received PIP claims from Florida Spine, that Hess was the true medical director at the four Hess Clinics, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at those clinics.

118.    Hess never legitimately served as medical director at the Hess Clinics, inasmuch as he never conducted systematic reviews of the billing from those clinics to ensure that the billing was not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through those clinics, much less take any immediate corrective action. See Fla. Stat. § 400.9935(1).

119.    Indeed, given the fraudulent treatment and billing protocol described below – which was pervasive across the billing submitted to GEICO through the Hess Clinics – there is simply no way that Hess could have legitimately conducted systematic reviews of the billing from those clinics to ensure that the billing was not fraudulent or unlawful.

120.    In fact, Hess could not possibly have legitimately fulfilled his statutory duty to conduct systematic reviews of the massive amount of billing submitted to GEICO through the Hess Clinics.

121.    For example, between 2018 and the present, thousands of individual bills, containing thousands of discrete charges, were submitted to GEICO through the Hess Clinics.

122.    What is more, GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

123.    It is extremely improbable, to the point of impossibility, that the Defendants only submitted fraudulent billing to GEICO through the Hess Clinics and that the Defendants did not simultaneously bill other automobile insurers through those clinics.

124.    Accordingly, upon information and belief, the thousands of individual bills and thousands of individual charges submitted to GEICO that Hess falsely purported to "systematically review" at the Hess Clinics constituted only a fraction of the total number of bills that Hess falsely purported to "systematically review" during his phony tenure as "medical director" at those clinics.

125.    What is more, even as Hess was falsely purporting to serve as "medical director" at four separate Hess Clinics, he also was simultaneously purporting to personally perform – or at least directly supervise – a substantial amount of health care services that were billed to GEICO.

126.     For example, between November 2018 and the present alone, Hess purported to personally perform – or at least directly supervise – more than $125,000.00 worth of purported health care services that were billed to GEICO through various Florida Spine clinics.

127.     It is improbable, to the point of impossibility, that Hess actually could have fulfilled his statutory duty as medical director at four separate Hess Clinics, while simultaneously purporting to personally perform – or at least directly supervise – such a significant number of discrete health care services.

128.     What is more – and as set forth above – GEICO is only one of the many insurance companies in the Florida automobile insurance market.

129.     Accordingly, upon information and belief, the significant number of discrete health care services that Hess purported to personally perform or directly supervise during the period when he also was purporting to serve as medical director at four separate Hess Clinics constituted only a fraction of the total number of discrete health care services that Hess purported to personally perform or directly supervise during the period when he also was purporting to serve as medical director at those clinics.

130.     Against this backdrop, Hess did not, and could not have, "systematically reviewed" the massive amount of billing generated by the Hess Clinics.

131.     Florida Spine, TCFII, Feder, Fulcher, Brockelman, and Hess used the façade of Hess's phony "appointment" as the ersatz "medical director" at the Hess Clinics do indirectly what they were forbidden from doing directly – namely: (i) to operate those clinics without a legitimate medical director; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at those clinics; (iii) to permit health care services to be provided at Florida Spine by individuals who lacked the proper licensure to perform the services; and (iv) to use those

27

clinics as vehicles to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

**4.      Tort-Saade's Service as the Phony Medical Director at Florida Spine-Hialeah, Florida Spine-North Miami, and Florida Spine-West Dade**

132.    Additionally, after consolidating Feder and Hess's existing network of chiropractic and pain management offices, Florida Spine, TCFII, Feder, Hess, Fulcher, and Brockelman retained Tort-Saade, a licensed physician who was willing to falsely pose as the legitimate medical director at the Florida Spine clinics known as Florida Spine-Hialeah, Florida Spine-North Miami, and Florida Spine-West Dade (collectively the "Tort-Saade Clinics").

133.    In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to grant maintain Florida Spine's licensure and to permit Florida Spine to operate the Tort-Saade Clinics, Florida Spine, TCFII, Feder, Hess, Fulcher, and Brockelman entered into a secret scheme with Tort-Saade.

134.    Specifically, in exchange for compensation from Florida Spine, TCFII, Feder, Hess, Fulcher, and Brockelman, Tort-Saade agreed to falsely represent, to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at Florida Spine, and to the insurers including GEICO that received PIP claims from Florida Spine, that he was the true medical director at the three Tort-Saade Clinics, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at those clinics.

135.    However, Tort-Saade never legitimately served as medical director at the Tort-Saade Clinics inasmuch as he never conducted systematic reviews of the billing from those clinics to ensure that the billing was not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through those clinics, much less take any immediate corrective action. See Fla. Stat. § 400.9935(1).

136.     Indeed, given the fraudulent treatment and billing protocol described below – which was pervasive across the billing submitted to GEICO through the Tort-Saade Clinics – there is simply no way that Tort-Saade could have legitimately conducted systematic reviews of the billing from those clinics to ensure that the billing was not fraudulent or unlawful.

137.     In fact, Tort-Saade – who, upon information and belief based on public records and database searches, spent most of his time in Puerto Rico during his purported tenure as medical director at the Tort-Saade Clinics – could not possibly have legitimately fulfilled his statutory duty to conduct systematic reviews of the massive amount of billing submitted to GEICO through the Tort-Saade Clinics.

138.     For example, Tort-Saade, simultaneous to his appointment as the ersatz "medical director" at the Tort-Saade Clinics, also served as President of the Tort Orthopaedic Institute in Puerto Rico (the "Tort Institute").

139.     In fact, based upon a review of the Tort Institute website, Tort-Saade – during his purported tenure as "medical director" at the Tort-Saade Clinics – was scheduled to provide services in Puerto Rico at one of the Tort Institute locations seven days a week.

140.     It is improbable, to the point of impossibility, that Tort-Saade actually could have fulfilled his statutory duty as medical director at three separate Tort-Saade Clinics, while concentrating such a large portion of his time at the Tort Institute in Puerto Rico.

141.     For example, between 2018 and the present, thousands of individual bills, containing thousands of discrete charges, were submitted to GEICO through the Tort-Saade Clinics.

142.     What is more, GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

143.    It is extremely improbable, to the point of impossibility, that the Defendants only submitted fraudulent billing to GEICO through the Tort-Saade Clinics and that the Defendants did not simultaneously bill other automobile insurers through those clinics.

144.    Accordingly, upon information and belief, the thousands of individual bills and thousands of individual charges submitted to GEICO that Tort-Saade falsely purported to "systematically review" at the Tort-Saade Clinics constituted only a fraction of the total number of bills that Tort-Saade falsely purported to "systematically review" during his phony tenure as "medical director" at those clinics.

145.    Not even a legitimate physician who exclusively was employed as a medical director at the Tort-Saade Clinics and who lived in close proximity to the Tort-Saade Clinics could have "systematically reviewed" the massive amount of billing generated by the Tort-Saade Clinics.

146.    Florida Spine, TCFII, Feder, Hess, Fulcher, and Brockelman used the façade of Tort-Saade's phony "appointment" as the ersatz "medical director" at the Tort-Saade Clinics to do indirectly what they were forbidden from doing directly – namely: (i) to operate those clinics without a legitimate medical director; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at those clinics; (iii) to permit health care services to be provided at Florida Spine by individuals who lacked the proper licensure to perform the services; and (iv) to use those clinics as vehicles to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

147.    Tort-Saade unlawfully permitted Florida Spine, TCFII, Feder, Hess, Fulcher, and Brockelman to dictate the manner in which Insureds would be treated at the Tort-Saade Clinics, and to dictate every aspect of the manner in which health care services at those clinics would be

billed to GEICO and other insurers, because he sought to continue profiting from the Defendants' fraudulent scheme.

## C.     The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at Florida Spine

148.    In keeping with the fact that Warheit, Greenberg, Hess, and Tort-Saade never truly served as medical directors at any of the Florida Spine clinics, and never fulfilled the statutory obligations of clinic medical directors at the Florida Spine clinics, Florida Spine, TCFII, Feder, Fulcher, Brockelman, Warheit, Greenberg, Hess, and Tort-Saade permitted Amar, Danieli, Englander, Lopez, Sanon, and White (collectively the "Chiropractic Defendants") and other chiropractors associated with Florida Spine to routinely falsely represent the identities of the health care providers who rendered services at Florida Spine, in order to obtain payment for the Fraudulent Services to which they otherwise would not be entitled.

149.    The Defendants billed for a limited range of health care services and goods through Florida Spine, specifically: (i) purported initial patient examinations; (ii) purported follow-up patient examinations; (iii) purported physical therapy and chiropractic services; and (iv) purported pain management injections.

150.    As set forth in Exhibit "1", the purported physical therapy services constituted the vast majority of the services and goods that the Defendants billed through Florida Spine to GEICO.

151.    A substantial amount of the physical therapy services that were billed through Florida Spine to GEICO were performed – to the extent that they were performed at all – by unsupervised massage therapists.

152.    As set forth above, prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics, to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by

31

a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

153.    However – and again, as set forth above – in response to rampant PIP fraud involving massage therapists and massage, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for services provided by massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5).

154.    As a result, with respect to insurance policies issued after January 1, 2013, the No-Fault Law has prohibited Florida Spine from recovering PIP Benefits for services – including but not limited to physical therapy services – provided by unsupervised massage therapists.

155.    What is more, and as set forth above, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy. See Fla. Stat. § 486.028.

156.    The massage therapists associated with Florida Spine were licensed as massage therapists. They never were licensed as physical therapists.

157.    The Defendants were well-aware of the fact that – with respect to insurance policies issued after January 1, 2013 – Florida Spine could not legally recover PIP Benefits for services provided by unsupervised massage therapists.

158.    For example, the amendments to the No-Fault Law prohibiting PIP reimbursement for massage or for services provided by massage therapists were widely reported, as was the preceding legal struggle by various massage therapists and massage trade organizations to fight the amendments.

159.    Accordingly, the Defendants submitted tens of thousands of physical therapy charges through Florida Spine to GEICO which falsely contended that the Chiropractic Defendants

and other chiropractors associated with Florida Spine had performed or at least directly supervised the underlying physical therapy services.

160.     In fact, given the volume of the physical therapy services at issue, the Chiropractic Defendants and other chiropractors associated with Florida Spine did not – and could not have – personally performed or even directly supervised the services.

161.     For example:

(i)     On January 9, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade purported to provide at least 67 individual physical therapy services to at least 13 individual Insureds, and falsely contended in the resulting bills to GEICO that Sanon personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 9.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Sanon also purported to personally perform, or at least directly supervise: (a) one 30 minute initial patient examination and eleven five minute follow-up patient examinations. In all, GEICO received billing for at least 10.75 hours of services that Sanon purported to personally perform, or at least directly supervise, on January 9, 2019. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(ii)    On January 10, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade purported to provide at least 69 individual physical therapy services to at least 12 individual Insureds at Florida Spine-North Miami, and falsely contended in the resulting bills to GEICO that Sanon personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 11.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(iii)   On February 13, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade purported to provide at least 69 individual physical therapy services to at least 14 individual Insureds at Florida Spine-North Miami, and falsely contended in the resulting bills to GEICO that Sanon personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 10.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Sanon also purported to personally

perform, or at least directly supervise: (a) one 30-minute initial patient examination; and (b) 12 five minute follow-up patient examinations. In all, GEICO received billing for at least 12.5 hours of services that Sanon purported to personally perform, or at least directly supervise, on February 13, 2019. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(iv)     On February 22, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade purported to provide at least 70 individual physical therapy services to at least 13 individual Insureds at Florida Spine-North Miami, and falsely contended in the resulting bills to GEICO that Sanon personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 11.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(v)      On February 26, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade purported to provide at least 83 individual physical therapy services to at least 15 individual Insureds at Florida Spine-North Miami, and falsely contended in the resulting bills to GEICO that Sanon personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 13.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(vi)     On February 28, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade purported to provide at least 90 individual physical therapy services to at least 16 individual Insureds at Florida Spine-North Miami, and falsely contended in the resulting bills to GEICO that Sanon personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 14.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(vii)    On March 4, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg purported to provide at least 63 individual physical therapy services to at least 12 individual Insureds at Florida Spine-Kendall, and falsely contended in the resulting bills to GEICO that Amar personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 10.75 hours of physical therapy services that required direct, one-

on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Amar <u>also</u> purported to personally perform, or at least directly supervise 11 five minute follow-up patient examinations at Florida Spine-Kendall. In all, GEICO received billing for at least 11.75 hours of services that Amar purported to personally perform, or at least directly supervise, on March 4, 2019.  In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(viii)    On March 5, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, Warheit, and Tort-Saade purported to provide at least 72 individual physical therapy services to at least 13 individual Insureds at two separate Florida Spine clinics, including Florida Spine-North Miami and Florida Spine-West Hollywood, and falsely contended in the resulting bills to GEICO that White personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 11.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, White <u>also</u> purported to personally perform, or at least directly supervise: (a) thirteen five minute follow-up patient examinations; and (b) one 30 minute initial patient examination. In all, GEICO received billing for at least 13.25 hours of services that White purported to personally perform, or at least directly supervise, on March 5, 2019, at two separate Florida Spine clinics. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(ix)    On March 6, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg purported to provide at least 60 individual physical therapy services to at least 11 individual Insureds at Florida Spine-Kendall, and falsely contended in the resulting bills to GEICO that Amar personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 10 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Amar <u>also</u> purported to personally perform, or at least directly supervise 11 five minute follow-up patient examinations at Florida Spine-Kendall. In all, GEICO received billing for at least 11 hours of services that Amar purported to personally perform, or at least directly supervise, on March 6, 2019. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(x)    On March 7, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade purported to provide at least 72 individual physical therapy services to at least 13 individual Insureds at Florida Spine-North Miami, and falsely contended in the resulting bills to GEICO that Sanon personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 11.50 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds

throughout the services. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(xi)     On March 8, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit purported to provide at least 76 individual physical therapy services to at least 14 individual Insureds at two separate Florida Spine clinics, including Florida Spine-West Broward and Florida Spine-West Hollywood, and falsely contended in the resulting bills to GEICO that White personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 11.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, White also purported to personally perform, or at least directly supervise 14 five minute follow-up patient examinations. In all, GEICO received billing for at least 12.5 hours of services that White purported to personally perform, or at least directly supervise, on March 8, 2019, at two separate Florida Spine clinics. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(xii)    On March 11, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg purported to provide at least 60 individual physical therapy services to at least 11 individual Insureds at Florida Spine-Kendall, and falsely contended in the resulting bills to GEICO that Amar personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 10 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Amar also purported to personally perform, or at least directly supervise: (a) one thirty-minute initial patient examination; and (b) 10 five minute follow-up patient examinations at Florida Spine-Kendall. In all, GEICO received billing for at least 11.5 hours of services that Amar purported to personally perform, or at least directly supervise, on March 11, 2019. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(xiii)   On March 20, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, Warheit, and Tort-Saade purported to provide at least 73 individual physical therapy services to at least 13 individual Insureds at two separate Florida Spine clinics, including Florida Spine-North Miami and Florida Spine-West Hollywood, and falsely contended in the resulting bills to GEICO that White personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 12 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, White also purported to personally perform, or at least directly supervise: (a) 12 five minute follow-up patient examinations; and (b) one 30 minute initial patient examination.

In all, GEICO received billing for at least 13.25 hours of services that White purported to personally perform, or at least directly supervise, on March 20, 2019, at two separate Florida Spine clinics. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(xiv)  On March 29, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade purported to provide at least 85 individual physical therapy services to at least 16 individual Insureds at Florida Spine-North Miami, and falsely contended in the resulting bills to GEICO that Sanon personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 13.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Sanon <u>also</u> purported to personally perform, or at least directly supervise two 15-minute follow-up patient examinations. In all, GEICO received billing for at least 14 hours of services that Sanon purported to personally perform, or at least directly supervise, on March 29, 2019. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(xv)  On April 4, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit purported to provide at least 92 individual physical therapy services to at least 19 individual Insureds at Florida Spine-West Broward, and falsely contended in the resulting bills to GEICO that Lopez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 12.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Lopez <u>also</u> purported to personally perform, or at least directly supervise: (a) three 30-minute initial patient examinations; and (b) 16 five minute follow-up patient examinations at Florida Spine-West Broward. In all, GEICO received billing for at least 15.5 hours of services that Lopez purported to personally perform, or at least directly supervise, on April 4, 2019. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(xvi)  On April 17, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit purported to provide at least 89 individual physical therapy services to at least 18 individual Insureds at Florida Spine-West Broward, and falsely contended in the resulting bills to GEICO that Lopez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 12.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Lopez <u>also</u> purported to personally perform, or at least directly supervise 17 five minute follow-up patient examinations at Florida Spine-West Broward. In all, GEICO received billing for at

least 13.75 hours of services that Lopez purported to personally perform, or at least directly supervise, on April 17, 2019. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(xvii) On April 17, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg purported to provide at least 60 individual physical therapy services to at least 10 individual Insureds at Florida Spine-Kendall, and falsely contended in the resulting bills to GEICO that Amar personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 10 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(xviii) On April 19, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit purported to provide at least 78 individual physical therapy services to at least 15 individual Insureds at Florida Spine-West Broward, and falsely contended in the resulting bills to GEICO that Lopez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 11 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Lopez also purported to personally perform, or at least directly supervise 14 five minute follow-up patient examinations at Florida Spine-West Broward. In all, GEICO received billing for at least 12 hours of services that Lopez purported to personally perform, or at least directly supervise, on April 19, 2019. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(xix) On April 22, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit purported to provide at least 87 individual physical therapy services to at least 17 individual Insureds at Florida Spine-West Broward, and falsely contended in the resulting bills to GEICO that Lopez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 12.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Lopez also purported to personally perform, or at least directly supervise 14 five minute follow-up patient examinations at Florida Spine-West Broward. In all, GEICO received billing for at least 13.75 hours of services that Lopez purported to personally perform, or at least directly supervise, on April 22, 2019. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(xx) On April 24, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit purported to provide at least 89 individual physical therapy services to at least 17 individual Insureds at two separate Florida Spine clinics, including Florida Spine-West Broward and Florida Spine-West Hollywood, and falsely contended in the resulting bills to GEICO that White personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 13.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, White also purported to personally perform, or at least directly supervise 11 five minute follow-up patient examinations. In all, GEICO received billing for at least 14 hours of services that White purported to personally perform, or at least directly supervise, on April 24, 2019, at two separate Florida Spine clinics. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(xxi) On April 26, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, Warheit and Tort-Saade purported to provide at least 117 individual physical therapy services to at least 23 individual Insureds at three separate Florida Spine clinics, including Florida Spine-Hialeah, Florida Spine-West Broward, and Florida Spine-West Hollywood, and falsely contended in the resulting bills to GEICO that White personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 17.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, White also purported to personally perform, or at least directly supervise 23 five minute follow-up patient examinations. In all, GEICO received billing for at least 19.25 hours of services that White purported to personally perform, or at least directly supervise, on April 26, 2019, at three separate Florida Spine clinics. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(xxii) On April 30, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit purported to provide at least 68 individual physical therapy services to at least 15 individual Insureds at Florida Spine-West Broward, and falsely contended in the resulting bills to GEICO that Lopez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 10 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Lopez also purported to personally perform, or at least directly supervise: (a) 14 five minute follow-up patient examinations; and (b) one thirty minute initial patient examination. In all, GEICO received billing for at least 11.5 hours of services that Lopez purported to personally perform, or at least directly supervise, on April 30, 2019. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(xxiii)  On May 1, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit purported to provide at least 62 individual physical therapy services to at least 13 individual Insureds at Florida Spine West Broward, and falsely contended in the resulting bills to GEICO that Lopez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 9.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Lopez also purported to personally perform, or at least directly supervise 12 five minute follow-up patient examinations at Florida Spine-West Broward. In all, GEICO received billing for at least 10.25 hours of services that Lopez purported to personally perform, or at least directly supervise, on May 1, 2019. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(xxiv)  On May 23, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit purported to provide at least 65 individual physical therapy services to at least 14 individual Insureds at Florida Spine-West Broward, and falsely contended in the resulting bills to GEICO that Lopez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 9.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Lopez also purported to personally perform, or at least directly supervise: (a) 10 five minute follow-up patient examinations, one thirty minute initial patient examination; and (b) three 15 minute follow-up patient examinations at Florida Spine-West Broward. In all, GEICO received billing for at least 11.25 hours of services that Lopez purported to personally perform, or at least directly supervise, on May 23, 2019.  In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(xxv)  On May 31, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg purported to provide at least 47 individual physical therapy services to at least 10 individual Insureds at Florida Spine-Kendall, and falsely contended in the resulting bills to GEICO that Amar personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 9.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Amar also purported to personally perform, or at least directly supervise 9 five minute follow-up patient examinations at Florida Spine-Kendall. In all, GEICO received billing for at least 10.25 hours of services that Amar purported to personally perform, or at least directly supervise, on May 31, 2019. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(xxvi)  On June 13, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit purported to provide at least 57 individual physical therapy services to at least 12 individual Insureds at Florida Spine-West Broward, and falsely contended in the resulting bills to GEICO that Lopez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 8.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Lopez <u>also</u> purported to personally perform, or at least directly supervise: (a) 10 five minute follow-up patient examinations; (b) one thirty minute initial patient examination; and (c) one fifteen minute follow-up patient examinations at Florida Spine-West Broward. In all, GEICO received billing for at least 10 hours of services that Lopez purported to personally perform, or at least directly supervise, on June 13, 2019. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(xxvii)  On June 24, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit purported to provide at least 70 individual physical therapy services to at least 15 individual Insureds at Florida Spine-West Broward, and falsely contended in the resulting bills to GEICO that Lopez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 9.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Lopez <u>also</u> purported to personally perform, or at least directly supervise 16 five minute follow-up patient examinations at Florida Spine-West Broward. In all, GEICO received billing for at least 11.75 hours of services that Lopez purported to personally perform, or at least directly supervise, on June 24, 2019. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(xxviii) On July 1, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit purported to provide at least 74 individual physical therapy services to at least 15 individual Insureds at Florida Spine-West Broward, and falsely contended in the resulting bills to GEICO that Lopez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 10.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Lopez <u>also</u> purported to personally perform, or at least directly supervise 11 five minute follow-up patient examinations at Florida Spine-West Broward. In all, GEICO received billing for at least 11.5 hours of services that Lopez purported to personally perform, or at least directly supervise, on July 1, 2019. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(xxix)  On July 8, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit purported to provide at least 59 individual physical therapy services to at least 13 individual Insureds at Florida Spine-West Broward, and falsely contended in the resulting bills to GEICO that Lopez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 8.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Lopez <u>also</u> purported to personally perform, or at least directly supervise: (a) twelve five minute follow-up patient examinations; and (b) one thirty minute initial patient examination at Florida Spine-West Broward. In all, GEICO received billing for at least 9.75 hours of services that Lopez purported to personally perform, or at least directly supervise, on July 8, 2019. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

(xxx)  On October 24 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade purported to provide at least 57 individual physical therapy services to at least 12 individual Insureds at Florida Spine-North Miami, and falsely contended in the resulting bills to GEICO that Sanon personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 8.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Sanon <u>also</u> purported to personally perform, or at least directly supervise: (a) two 30-minute initial patient examinations; and (b) three 15-minute follow-up patient examinations that were performed on five <u>additional</u> GEICO Insureds at Florida Spine-North Miami. In all, GEICO received billing for at least 10.25 hours of services that Sanon purported to personally perform, or at least directly supervise, on October 24, 2019. In reality, the underlying physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists.

162.    These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Amar, Lopez, Sanon, and White routinely falsely represented that they had performed – or at least directly supervised – an improbable, and often impossible, number of physical therapy services on individual dates.

163.    Upon information and belief, the fraudulent billing for physical therapy services that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, and the Chiropractic Defendants submitted or caused to be submitted through Florida Spine to

GEICO constituted only a fraction of the <u>total</u> fraudulent billing for physical therapy services that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, and the Chiropractic Defendants submitted through Florida Spine to <u>all</u> of the automobile insurers in the Florida automobile insurance market.

164. GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

165. It is extremely improbable, to the point of impossibility, that Florida Spine only submitted fraudulent billing to GEICO, and that Florida Spine did not simultaneously bill other automobile insurers.

166. Thus, upon information and belief, the impossible number of physical therapy services that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Amar, Lopez, Sanon, and White purported to directly supervise or provide to GEICO Insureds at the Florida Spine clinics on individual dates of service, including the dates of service identified above, constituted only a fraction of the <u>total</u> number of physical therapy services that they purported to directly supervise or provide at Florida Spine, including to individuals insured by companies other than GEICO, on those same dates of service.

167. In fact, the Chiropractic Defendants did not perform or directly supervise the physical therapy services that were billed through Florida Spine to GEICO.

168. As set forth above, the No-Fault Law's billing requirements provide – among other things – that all PIP billing must comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms. <u>See</u> Fla. Stat. § 627.736.

169. All of the billing that the Defendants submitted through Florida Spine to GEICO, including the billing for putative physical therapy services, was submitted on HCFA-1500 forms.

170.     Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, the name of the health care provider who actually rendered the underlying physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

171.     The Defendants were well-aware of the fact that – because the providers providing the physical therapy services were unsupervised massage therapists, rather than physical therapists – Florida Spine could not recover PIP Benefits for any services that the massage therapists purported to provide with respect to insurance policies issued after January 1, 2013.

172.     As a result, and in order to conceal the fact that the unsupervised massage therapists unlawfully provided a significant portion of the "physical therapy" services that were billed through Florida Spine to GEICO with respect to insurance policies issued after January 1, 2013, the Defendants deliberately omitted any reference to any massage therapists on the HCFA-1500 forms that they used to bill for the putative physical therapy services.

173.     Instead, in the claims for physical therapy services identified in Exhibit "1", the Defendants routinely falsely listed a chiropractor on the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services.

174.     For example:

(i)      On or about December 24, 2018, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit billed GEICO for physical therapy services that purportedly were provided through Florida Spine-West Hollywood to an Insured named BL on December 24, 2018. The HCFA-1500 form falsely represented that White performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

44

(ii)     On or about January 7, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit billed GEICO for physical therapy services that purportedly were provided through Florida Spine-West Hollywood to an Insured named WS on January 7, 2019. The HCFA-1500 form falsely represented that White performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

(iii)    On or about January 8, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit billed GEICO for physical therapy services that purportedly were provided through Florida Spine-Pompano to an Insured named CT on January 8, 2019. The HCFA-1500 form falsely represented that Englander performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

(iv)     On or about January 29, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Warheit billed GEICO for physical therapy services that purportedly were provided through Florida Spine-Pompano to an Insured named CT on January 29, 2019. The HCFA-1500 form falsely represented that Amar performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Warheit deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

(v)      On or about February 3, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade billed GEICO for physical therapy services that purportedly were provided through Florida Spine-North Miami to an Insured named PC on February 3, 2019. The HCFA-1500 form falsely represented that Sanon performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

(vi)     On or about February 15, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade billed GEICO for physical therapy services that purportedly were provided through Florida Spine-North Miami to an Insured named JQ on February 15, 2019. The HCFA-1500 form falsely represented that Sanon performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and

Tort-Saade deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

(vii)     On or about February 20, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade billed GEICO for physical therapy services that purportedly were provided through Florida Spine-North Miami to an Insured named SC on February 15, 2019. The HCFA-1500 form falsely represented that Sanon performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

(viii)    On or about February 28, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit billed GEICO for physical therapy services that purportedly were provided through Florida Spine-Pompano to an Insured named TJ on February 28, 2019. The HCFA-1500 form falsely represented that White performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

(ix)     On or about March 2, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit billed GEICO for physical therapy services that purportedly were provided through Florida Spine-Pompano to an Insured named EJ on March 2, 2019. The HCFA-1500 form falsely represented that Englander performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

(x)      On or about March 13, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit billed GEICO for physical therapy services that purportedly were provided through Florida Spine-Pompano to an Insured named SB on March 13, 2019. The HCFA-1500 form falsely represented that Englander performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

(xi)     On or about March 22, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Tort-Saade billed GEICO for physical therapy services

that purportedly were provided through Florida Spine-Hialeah to an Insured named RE on March 22, 2019. The HCFA-1500 form falsely represented that White performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Tort-Saade deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

(xii)   On or about March 25, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit billed GEICO for physical therapy services that purportedly were provided through Florida Spine-Margate to an Insured named DE on March 25, 2019. The HCFA-1500 form falsely represented that Danieli performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

(xiii)  On or about March 25, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade billed GEICO for physical therapy services that purportedly were provided through Florida Spine-North Miami to an Insured named TT on March 25, 2019. The HCFA-1500 form falsely represented that Sanon performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

(xiv)   On or about March 29, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade billed GEICO for physical therapy services that purportedly were provided through Florida Spine-Hialeah to an Insured named TA on March 29, 2019. The HCFA-1500 form falsely represented that Sanon performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

(xv)    On or about April 4, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit billed GEICO for physical therapy services that purportedly were provided through Florida Spine-Margate to an Insured named HG on April 4, 2019. The HCFA-1500 form falsely represented that Danieli performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit deliberately omitted any reference to the unsupervised massage therapist who actually

performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

(xvi)  On or about April 10, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit billed GEICO for physical therapy services that purportedly were provided through Florida Spine-West Hollywood to an Insured named JS on March 13, 2019. The HCFA-1500 form falsely represented that White performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

(xvii)  On or about April 11, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg billed GEICO for physical therapy services that purportedly were provided through Florida Spine-Kendall to an Insured named JA on April 11, 2019. The HCFA-1500 form falsely represented that Amar performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

(xviii)  On or about April 17, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg billed GEICO for physical therapy services that purportedly were provided through Florida Spine-Kendall to an Insured named TF on April 17, 2019. The HCFA-1500 form falsely represented that Amar performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

(xix)  On or about April 18, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander and Warheit billed GEICO for physical therapy services that purportedly were provided through Florida Spine-Pompano to an Insured named NR on April 18, 2019. The HCFA-1500 form falsely represented that Englander performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

(xx)  On or about May 2, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit billed GEICO for physical therapy services that purportedly were provided through Florida Spine-Margate to an Insured named JW on May 2,

2019. The HCFA-1500 form falsely represented that Danieli performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

(xxi)   On or about May 3, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for physical therapy services that purportedly were provided through Florida Spine-West Broward to an Insured named AS on May 3, 2019. The HCFA-1500 form falsely represented that Lopez performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

(xxii)  On or about May 20, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit billed GEICO for physical therapy services that purportedly were provided through Florida Spine-Margate to an Insured named SO on May 20, 2019. The HCFA-1500 form falsely represented that Danieli performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

(xxiii) On or about May 21, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade billed GEICO for physical therapy services that purportedly were provided through Florida Spine-North Miami to an Insured named JB on May 21, 2019. The HCFA-1500 form falsely represented that Sanon performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

(xxiv)  On or about May 23, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for physical therapy services that purportedly were provided through Florida Spine-West Broward to an Insured named AV on May 23, 2019. The HCFA-1500 form falsely represented that Lopez performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form

(xxv)    On or about May 24, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for physical therapy services that purportedly were provided through Florida Spine-West Broward to an Insured named KB on May 24, 2019. The HCFA-1500 form falsely represented that Lopez performed, or at least directly supervised, the pertinent physical therapy services, and Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit deliberately omitted any reference to the unsupervised massage therapist who actually performed the services, to the extent that they were performed at all, from the HCFA-1500 form.

175.    These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, and the Chiropractic Defendants routinely falsely represented in the HCFA-1500 forms they submitted to GEICO that a chiropractor had performed or directly supervised the underlying physical therapy services, when in fact the services were performed by unsupervised massage therapists, to the extent that they were performed at all.

176.    In the claims for physical therapy services identified in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, and the Chiropractic Defendants routinely fraudulently misrepresented that the physical therapy services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)    the putative physical therapy services were unlawfully performed – to the extent they were performed at all – by massage therapists, without any supervision by a licensed physician, chiropractor, or physical therapist, in contravention of Florida law;

(ii)    Florida Spine could not lawfully recover PIP Benefits for the putative physical therapy services, because they were unlawfully performed by unsupervised massage therapists; and

(iii)    the Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who performed the putative physical therapy services in their billing for the putative "physical therapy" services.

177.    These fraudulent misrepresentations and acts of fraudulent concealment demonstrate that Florida Spine was operated without legitimate medical directors.

178.    In this context, Warheit, Greenberg, Hess, and Tort-Saade – who at all relevant times purported to serve as the "medical directors" of the Florida Spine clinics – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

179.    Had Warheit, Greenberg, Hess, and Tort-Saade actually fulfilled their statutory role as the medical directors at the Florida Spine clinics, they would have noted – among other things – that Florida Spine's billing routinely falsely represented that the underlying physical therapy services were performed or at least directly supervised by the Chiropractic Defendants or other chiropractors.

180.    Had Warheit, Greenberg, Hess, and Tort-Saade actually fulfilled their statutory role as the medical directors at the Florida Spine clinics, they would have ensured – among other things – that all of the individuals providing physical therapy services had active appropriate licensure to perform physical therapy services.

181.    Warheit, Greenberg, Hess, and Tort-Saade failed to do so, because they never actually served as legitimate medical directors at the Florida Spine clinics in the first instance, rendering Florida Spine ineligible to collect PIP Benefits in the first instance.

**D.    The Fraudulent Treatment and Billing Protocol at the Florida Spine Clinics**

182.    In keeping with the fact that the Florida Spine clinics were operated without legitimate medical directors, the Florida Spine clinics were used as vehicles to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

183.    In the claims identified in Exhibit "1", the majority of the Insureds whom the Defendants purported to treat at the Florida Spine clinics were involved in minor accidents, to the extent that they were involved in any actual accidents at all.

184.    Concomitantly, in the claims identified in Exhibit "1", almost none of the Insureds to whom the Defendants purported to provide treatment at the Florida Spine clinics suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

185.    Even so, in the claims identified in Exhibit "1", the Defendants purported to subject the Insureds to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined, fraudulent protocols designed to maximize the billing that they could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

186.    The Defendants purported to provide their pre-determined fraudulent treatment protocols to the Insureds in the claims identified in Exhibit "1" without regard for the Insureds' individual symptoms or presentation, or – in most cases – the total absence of any actual continuing medical problems arising from any actual automobile accidents.

187.    Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

188.    No legitimate health care provider would permit the fraudulent treatment and billing protocols described below to proceed under his, her, or its auspices.

189.    The Defendants permitted the fraudulent treatment and billing protocols described below to proceed under their auspices because: (i) the Florida Spine clinics were, at all relevant times, operated in violation of the Clinic Act, without legitimate medical directors who legitimately fulfilled their statutory duties as medical directors; (ii) the putative "physical therapy" services that purportedly were provided to Insureds through the Florida Spine clinics were routinely provided – to the extent that they were provided at all – by unsupervised massage therapists without legitimate oversight and supervision, rather than by or under the supervision of licensed physical therapists or physicians, in further violation of Florida law; and (iii) the Defendants sought to profit from the fraudulent billing they submitted to GEICO and other insurers.

**1.    The Fraudulent Charges for Initial Examinations**

190.    As an initial step in the fraudulent treatment and billing protocol at the Florida Spine clinics, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Hess, Tort-Saade, Crocco, Layton, Rivera, and the Chiropractic Defendants purported to provide the Insureds in the claims identified in Exhibit "1" with a putative initial examination.

191.    As set forth in Exhibit "1", the purported initial examinations then were billed through Florida Spine to GEICO under CPT code 99203, typically resulting in charges between $275.00 and $550.00 for each purported initial examination.

192.    In the claims for initial examinations identified in Exhibit "1", the charges for the initial examinations were fraudulent in that they misrepresented Florida Spine's eligibility to collect PIP Benefits in the first instance.

193.    In fact, and as set forth above, Florida Spine never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

194.    As set forth below, the charges for the initial examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

**a.    Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

195.    As set forth above, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of current procedural terminology, or CPT, codes. See Fla. Stat. § 627.736.

196.    The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

197.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the Insured presented with problems of moderate severity.

198.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

199.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

(i)    Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)    Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)    Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)     Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)      Initial office visit with couple for counseling concerning voluntary vasectomy for sterility Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

200.    Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

201.    By contrast, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

202.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "1" either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low or minimal severity, in many of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents. To the limited extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis and then discharged with nothing more serious than a minor soft tissue injury diagnosis such as a sprain or strain.

203.    Furthermore, in many of the claims identified in Exhibit "1", contemporaneous police reports indicated that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in the accidents, or injured at all.

204.    Even so, in the claims for initial examinations identified in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, and Tort-Saade routinely billed for the putative initial examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

205.    For example:

(i)    On December 11, 2018, an Insured named WM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to WM's vehicle, that there was minor damage to the other vehicle, that the airbags in WM's vehicle did not deploy, and that WM's vehicle was drivable following the accident. The police report further indicated that WM was not injured in the accident. In keeping with the fact that WM was not seriously injured in the accident, WM did not visit any hospital emergency room following the accident. To the extent that WM suffered any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of WM by Layton at Florida Spine-Kendall on March 4, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Layton, and Greenberg billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that WM presented with moderately severe health problems as a result of the accident.

(ii)   On January 8, 2019, an Insured named MD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MD's vehicle did not deploy, and that MD's vehicle was drivable following the accident. The police report further indicated that MD was not seriously injured in the accident. In keeping with the fact that MD was not seriously injured in the accident, MD did not visit any hospital emergency room following the accident. To the extent that MD suffered any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of MD by Lopez at Florida Spine-West Broward on January 16, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that MD presented with moderately severe health problems as a result of the accident. What it more, following an additional purported initial examination of MD by Layton at Florida Spine-Coral Springs on January 21, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Layton, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that MD presented with moderately severe health problems as a result of the accident.

(iii)  On January 11, 2019, an Insured named CT was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CT's vehicle did not deploy, and that CT's vehicle was drivable following the accident. The police report further indicated that CT was not injured in the accident. In

keeping with the fact that CT was not seriously injured in the accident, CT did not visit any hospital emergency room following the accident. To the extent that CT suffered any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of CT by Englander at Florida Spine-Pompano on January 18, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that CT presented with moderately severe health problems as a result of the accident.  What is more, following an additional purported initial examination of CT by Layton at Florida Spine-Coral Springs on January 21, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Layton and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that CT presented with moderately severe health problems as a result of the accident.

(iv)    On January 13, 2019, an Insured named TA was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to TA's vehicle, that there was minor damage to the other vehicle, that the airbags in TA's vehicle did not deploy, and that TA's vehicle was drivable following the accident. The police report further indicated that TA was not injured in the accident. In keeping with the fact that TA was not seriously injured in the accident, TA did not visit any hospital emergency room following the accident. To the extent that TA suffered any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of TA by White at Florida Spine-Hialeah on January 22, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Tort-Saade billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that TA presented with moderately severe health problems as a result of the accident.  What is more, following an additional purported initial examination of TA by Rivera at Florida Spine-Hialeah on January 31, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Rivera, and Tort-Saade billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that TA presented with moderately severe health problems as a result of the accident.

(v)    On January 13, 2019, an Insured named NR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in NR's vehicle did not deploy, and that NR's vehicle was drivable following the accident. The police report further indicated that NR was not seriously injured in the accident. In keeping with the fact that NR was not seriously injured in the accident, NR did not visit any hospital emergency room following the accident. To the extent that NR suffered any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of NR by Englander at Florida Spine-Pompano on January 15, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that NR presented with moderately severe health problems as a result of the accident.  What is more, following an additional purported initial examination of NR by Layton at

Florida Spine-Coral Springs on January 17, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Layton, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that NR presented with moderately severe health problems as a result of the accident.

(vi)     On January 23, 2019, an Insured named KC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in KC's vehicle did not deploy, and that KC's vehicle was drivable following the accident. The police report further indicated that KC was not injured in the accident. In keeping with the fact that KC was not seriously injured in the accident, KC did not visit any hospital emergency room following the accident. To the extent that KC suffered any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of KC by Amar at Florida Spine-Kendall on January 28, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that KC presented with moderately severe health problems as a result of the accident. What is more, following an additional purported initial examination of KC by Crocco at Florida Spine-Kendall on February 13, 2019, Florida Spine, TFCII, Feder, Hess, Fulcher, Brockelman, Crocco, and Greenberg billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that KC presented with moderately severe health problems as a result of the accident.

(vii)    On February 11, 2019, an Insured named TJ was involved in an automobile accident. The contemporaneous police report indicated that there was no damage to TJ's vehicle, that there was no damage to the other vehicle, that the airbags in TJ's vehicle did not deploy, and that TJ's vehicle was drivable following the accident. The police report further indicated that TJ was not seriously injured in the accident. In keeping with the fact that TJ was not seriously injured in the accident, TJ did not visit any hospital following the accident. To the extent that TJ suffered any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of TJ by White at Florida Spine-West Hollywood on February 12, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that TJ presented with moderately severe health problems as a result of the accident. What is more, following an additional purported initial examination of TJ by Crocco at Florida Spine-Hialeah on February 26, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Crocco, and Tort-Saade billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that TJ presented with moderately severe health problems as a result of the accident.

(viii)   On February 13, 2019, an Insured named SC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in SC's vehicle did not deploy, and that SC's vehicle was drivable following the accident. The police report further indicated that SC was not injured in the accident. In

keeping with the fact that SC was not seriously injured in the accident, SC did not visit any hospital emergency room following the accident. To the extent that SC suffered any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of SC by Sanon at Florida Spine-North Miami on February 20, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that SC presented with moderately severe health problems as a result of the accident. What is more, following an additional purported initial examination of SC by Crocco at Florida Spine-Kendall on April 17, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Crocco, and Greenberg billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that SC presented with moderately to highly severe presenting problems as a result of the accident.

(ix)    On February 27, 2019, an Insured named HS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in HS's vehicle did not deploy, and that HS's vehicle was drivable following the accident. The police report further indicated that HS was not injured in the accident. In keeping with the fact that HS was not seriously injured in the accident, HS did not visit any hospital emergency room following the accident. To the extent that HS suffered any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of HS by Lopez at Florida Spine-West Broward on March 4, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that HS presented with moderately severe health problems as a result of the accident.  What it more, following an additional purported initial examination of HS by Layton at Florida Spine- Coral Springs on March 11, 2019, Florida Spine, TCFII, Feder, Hess, Layton, and Warheit billed GEICO for a second initial examination using CPT code 99203, and thereby falsely represented that HS presented with moderately severe health problems as a result of the accident.

(x)    On March 2, 2019, an Insured named EJ was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to EJ's vehicle, that there was no damage to the other vehicle, that the airbags in EJ's vehicle did not deploy, and that EJ's vehicle was drivable following the accident. The police report further indicated that EJ was not seriously injured in the accident. In keeping with the fact that EJ was not seriously injured in the accident, EJ did not visit any hospital emergency room following the accident. To the extent that EJ suffered any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of EJ by Englander at Florida Spine-Pompano on March 13, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that EJ presented with moderately severe health problems as a result of the accident.

(xi)     On March 2, 2019, an Insured named HJ was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to HJ's vehicle, that there was no damage to the other vehicle, that the airbags in HJ's vehicle did not deploy, and that HJ's vehicle was drivable following the accident. The police report further indicated that HJ was not seriously injured in the accident. In keeping with the fact that HJ was not seriously injured in the accident, HJ did not visit any hospital emergency room following the accident. To the extent that HJ suffered any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of HJ by Englander at Florida Spine-Pompano on March 13, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that HJ presented with moderately severe health problems as a result of the accident.

(xii)    On March 5, 2019, an Insured named SJ was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to SJ's vehicle, that there was minor damage to the other vehicle, that the airbags in SJ's vehicle did not deploy, and that SJ's vehicle was drivable following the accident. The police report further indicated that SJ was not injured in the accident. In keeping with the fact that SJ was not seriously injured in the accident, SJ did not visit any hospital emergency room following the accident. To the extent that SJ suffered any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of SJ by Sanon at Florida Spine-North Miami on March 6, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that SJ presented with moderately severe health problems as a result of the accident.  What it more, following an additional purported initial examination of SJ by Layton at Florida Spine-Hialeah on March 8, 2019, Florida Spine, TCFII, Feder, Hess, Layton, and Tort-Saade billed GEICO for a second initial examination using CPT code 99203, and thereby falsely represented that SJ presented with moderately severe health problems as a result of the accident.

(xiii)   On May 15, 2019, an Insured named LT was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to LT's vehicle, that there was minor damage to the other vehicle, that the airbags in LT's vehicle did not deploy, and that LT's vehicle was drivable following the accident. The police report further indicated that LT was not injured in the accident. In keeping with the fact that LT was not seriously injured in the accident, LT did not visit any hospital emergency room following the accident. To the extent that LT suffered any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of LT by Lopez at Florida Spine-West Broward on May 22, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that LT presented with

moderately severe health problems as a result of the accident. What it more, following an additional purported initial examination of LT by Crocco at Florida Spine-Coral Springs on June 7, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Crocco, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that LT presented with moderately severe health problems as a result of the accident.

(xiv)   On June 7, 2019, an Insured named CT was involved in an automobile accident. The contemporaneous police report indicated that CT's vehicle was drivable following the accident. The police report further indicated that CT was not seriously injured in the accident. In keeping with the fact that CT was not seriously injured in the accident, CT did not visit any hospital emergency room following the accident. To the extent that CT suffered any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of CT by Crocco at Florida Spine-West Hollywood on June 19, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Crocco, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that CT presented with moderately severe health problems as a result of the accident.

(xv)   On June 10, 2019, an Insured named MJ was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MJ's vehicle did not deploy, and that MJ's vehicle was drivable following the accident. The police report further indicated that MJ was not injured in the accident. In keeping with the fact that MJ was not seriously injured in the accident, MJ did not visit any hospital emergency room following the accident. To the extent that MJ suffered any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of MJ by Lopez at Florida Spine-West Broward on June 12, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that MJ presented with moderately severe health problems as a result of the accident. What it more, following an additional purported initial examination of MJ by Layton at Florida Spine-Coral Springs on June 17, 2019, Florida Spine, TCFII, Feder, Hess, Layton, and Warheit billed GEICO for a second initial examination using CPT code 99203, and thereby falsely represented that MJ presented with moderately severe health problems as a result of the accident.

(xvi)   On June 16, 2019, an Insured named GT was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to GT's vehicle, that the airbags in GT's vehicle did not deploy, and that GT's vehicle was drivable following the accident. The police report further indicated that GT was not injured in the accident. In keeping with the fact that GT was not seriously injured in the accident, GT did not visit any hospital emergency room following the accident. To the extent that GT  suffered any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial

examination of GT by Hess at Florida Spine-Coral Springs on June 20, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that GT presented with moderately severe health problems as a result of the accident. What it more, following an additional purported initial examination of GT by Lopez at Florida Spine-West Broward on June 21, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for a second initial examination using CPT code 99203, and thereby falsely represented that GT presented with moderately severe health problems as a result of the accident.

(xvii)    On June 19, 2019, an Insured named JF was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JF's vehicle did not deploy, and that JF's vehicle was drivable following the accident. The police report further indicated that JF was not injured in the accident. In keeping with the fact that JF was not seriously injured in the accident, JF did not visit any hospital emergency room following the accident. To the extent that JF suffered any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of JF by Lopez at Florida Spine-West Broward on June 21, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that JF presented with moderately severe health problems as a result of the accident. What is more, following an additional purported initial examination of JF by Layton at Florida Spine-Coral Springs on July 3, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Layton, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that JF presented with moderately severe health problems as a result of the accident.

(xviii)    On June 24, 2019, an Insured named CJ was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CJ's vehicle did not deploy, and that CJ's vehicle was drivable following the accident. The police report further indicated that CJ was not seriously injured in the accident. In keeping with the fact that CJ was not seriously injured in the accident, CJ did not visit any hospital emergency room following the accident. To the extent that CJ suffered any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of CJ by Crocco at Florida Spine-West Hollywood on July 16, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Crocco, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that CJ presented with moderately severe health problems as a result of the accident.

(xix)    On June 26, 2019, an Insured named HL was involved in an automobile accident. The contemporaneous police report indicated that the airbags in HL's vehicle did not deploy, and that HL's vehicle was drivable following the accident. The police report further indicated that HL was not injured in the accident. In keeping with the

fact that HL was not seriously injured in the accident, HL did not visit any hospital emergency room following the accident. To the extent that HL suffered any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of HL by Rivera at Florida Spine-Lake Worth on August 7, 2019, Florida Spine, TCFII, Fulcher, Brockelman, Feder, Rivera and Hess billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that HL presented with moderately severe health problems as a result of the accident.

(xx)    On June 29, 2019, an Insured named GJ was involved in an automobile accident. The contemporaneous police report indicated that the airbags in GJ's vehicle did not deploy. The police report further indicated that GJ was not injured in the accident. In keeping with the fact that GJ was not seriously injured in the accident, GJ did not visit any hospital emergency room following the accident. To the extent that GJ suffered any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of GJ by Lopez at Florida Spine-West Broward on July 3, 2019, Florida Spine, TCFII Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that GJ presented with moderately severe health problems as a result of the accident.  What is more, following an additional purported initial examination of GJ by Crocco at Florida Spine-Coral Springs on July 17, 2019, Florida Spine, TCFII Feder, Hess, Fulcher, Brockelman, Crocco, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that GJ presented with moderately severe health problems as a result of the accident.

206.    These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Florida Spine, TCFII, Feder, Fulcher, and Brockelman and – depending on the Florida Spine clinic at issue – either Warheit, Hess, Greenberg, and Tort-Saade, Rivera, Crocco, Layton, and one of the Chiropractic Defendants, routinely falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

207.    In the claims for initial examinations identified in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, and the Chiropractic Defendants routinely falsely represented that the Insureds presented

with problems of moderate severity in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

208.    In the claims for initial examinations identified in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, and the Chiropractic Defendants also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations, physical therapy services, and pain management injections.

**b.    Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

209.    What is more, in the claims identified in Exhibit "1", the charges for the initial examinations under CPT code 99203 misrepresented and exaggerated the amount of face-to-face time that the examining physician or chiropractor spent with the Insureds or the Insureds' families.

210.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination typically represents that the physician, physician assistant, or chiropractor who conducted the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

211.    As set forth in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, and the Chiropractic Defendants virtually always billed for their putative initial examinations using CPT code 99203, and thereby represented that the physician, physician assistant, or chiropractor who purported to

conduct the examinations spent at least 30 minutes of face-to-face time with the Insureds or their families during the examinations.

212.    In fact, in the initial examinations identified in Exhibit "1", the physicians, physician assistants, and chiropractors who purported to perform the initial examinations on behalf of Florida Spine almost never spent more than 15-20 minutes of face-to-face time with the Insureds or their families when conducting the examinations, much less 30 minutes.

213.    In keeping with the fact that the initial examinations in the claims identified in Exhibit "1" did not involve more than 15-20 minutes of face-to-face time with the Insureds, or the Insureds' families, to the extent that they were provided at all, the physicians, physician assistants, and chiropractors who performed the initial examinations on behalf of Florida Spine used template forms in conducting the examinations.

214.    All that was required to complete the template forms was a brief patient interview and a perfunctory physical examination of the Insureds, using a limited range of examination parameters.

215.    These interviews and examinations did not require the physicians, physician assistants, and chiropractors who performed the initial examinations on behalf of Florida Spine to spend more than 15-20 minutes of face-to-face time with the Insureds during the putative initial examinations.

216.    In the claims for initial examinations that are identified in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, and the Chiropractic Defendants routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable

under CPT code 99203 are reimbursable at higher rates than examinations that take less time to perform.

**c.      Misrepresentations Regarding "Detailed" Physical Examinations**

217.    Moreover, the claims identified in Exhibit "1" for initial examinations under CPT code 99203 routinely falsely represented the extent of the underlying physical examinations.

218.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the health care provider who performed the examination conducted a "detailed" physical examination.

219.    As set forth in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, and the Chiropractic Defendants virtually always billed for their putative initial examinations using CPT code 99203, and thereby represented that the physicians, physician assistants, and chiropractors who purported to conduct the examinations conducted a "detailed" physical examinations of the Insureds who purportedly received the examinations.

220.    Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the physician, physician assistant, or chiropractor performing the examination conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

221.    To the extent that the Insureds in the claims identified in Exhibit "1" had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to minor musculoskeletal complaints, specifically sprains and strains.

222.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician, physician assistant, or chiropractor has not conducted an extended examination of a patient's

musculoskeletal organ system unless the health care provider has documented findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)     general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)     examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)     examination of gait and station;

(vii)     inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)     coordination;

(ix)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)     examination of sensation.

223.    In the claims for initial examinations identified in Exhibit "1", when Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, and the Chiropractic Defendants billed for the initial examinations under CPT code 99203, they falsely represented that physicians, physician assistants, or chiropractors associated with Florida Spine had performed "detailed" patient examinations on the Insureds they purported to treat during the initial examinations.

224.     In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", the physicians, physician assistants, or chiropractors who purported to perform the initial examinations on behalf of Florida Spine did not conduct an extended examination of the Insureds' musculoskeletal systems.

225.     For instance, in the claims under CPT code 99203 identified in Exhibit "1", the physicians, physician assistants, or chiropractors who purported to perform the initial examinations on behalf of Florida Spine did not conduct an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i)      general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(ii)     examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iii)    brief assessment of mental status;

(iv)     examination of gait and station;

(v)      inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(vi)     coordination;

(vii)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(viii)   examination of sensation.

226.     For example:

(i)      On or about January 15, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit billed GEICO under CPT code 99203 for an initial examination that Englander purported to provide to an Insured named NR at Florida Spine-Pompano, and thereby represented that they had provided a

"detailed" physical examination to NR. However, Englander did not document an extended examination of NR's musculoskeletal system, despite the fact that – to the extent NR had any complaints at all as the result of her automobile accident – they were limited to minor musculoskeletal complaints.

(ii)     On or about January 22, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Tort-Saade billed GEICO under CPT code 99203 for an initial examination that White purported to provide to an Insured named TA at Florida Spine-Hialeah, and thereby represented that they had provided a "detailed" physical examination to TA. However, White did not document an extended examination of TA's musculoskeletal system, despite the fact that – to the extent TA had any complaints at all as the result of her automobile accident – they were limited to minor musculoskeletal complaints.

(iii)    On or about January 28, 2019, Florida Spine, TCFII, Feder, Hess, Amar, and Greenberg billed GEICO under CPT code 99203 for an initial examination that Amar purported to provide to an Insured named KC at Florida Spine-Kendall, and thereby represented that they had provided a "detailed" physical examination to KC. However, Amar did not document an extended examination of KC's musculoskeletal system, despite the fact that – to the extent KC had any complaints at all as the result of his automobile accident – they were limited to minor musculoskeletal complaints.

(iv)    On or about February 7, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit billed GEICO under CPT code 99203 for an initial examination that Danieli purported to provide to an Insured named HG at Florida Spine-Margate, and thereby represented that Danieli had provided a "detailed" physical examination to HG. However, Danieli did not document an extended examination of HG's musculoskeletal system, despite the fact that – to the extent HG had any complaints at all as the result of his automobile accident – they were limited to minor musculoskeletal complaints.

(v)     On or about February 7, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit billed GEICO under CPT code 99203 for an initial examination that Danieli purported to provide to an Insured named TE at Florida Spine-Margate, and thereby represented that Danieli had provided a "detailed" physical examination to TE. However, Danieli did not document an extended examination of TE's musculoskeletal system, despite the fact that – to the extent TE had any complaints at all as the result of his automobile accident – they were limited to minor musculoskeletal complaints.

(vi)    On or about February 12, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Tort-Saade billed GEICO under CPT code 99203 for an initial examination that White purported to provide to an Insured named TJ at Florida Spine-West Hollywood, and thereby represented that they had provided a "detailed" physical examination to TJ. However, White did not document an

extended examination of TJ's musculoskeletal system, despite the fact that – to the extent TJ had any complaints at all as the result of her automobile accident – they were limited to minor musculoskeletal complaints.

(vii)     On or about February 20, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade billed GEICO under CPT code 99203 for an initial examination that Sanon purported to provide to an Insured named SC at Florida Spine-North Miami, and thereby represented that they had provided a "detailed" physical examination to SC. However, Sanon did not document an extended examination of SC's musculoskeletal system, despite the fact that – to the extent SC had any complaints at all as the result of his automobile accident – they were limited to minor musculoskeletal complaints.

(viii)    On or about March 1, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit billed GEICO under CPT code 99203 for an initial examination that Danieli purported to provide to an Insured named SO at Florida Spine-Margate, and thereby represented that Danieli  had provided a "detailed" physical examination to SO. However, Danieli did not document an extended examination of SO's musculoskeletal system, despite the fact that – to the extent SO had any complaints at all as the result of her automobile accident – they were limited to minor musculoskeletal complaints.

(ix)      On or about March 6, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit billed GEICO under CPT code 99203 for an initial examination that Danieli purported to provide to an Insured named JW at Florida Spine-Margate, and thereby represented that Danieli  had provided a "detailed" physical examination to JW. However, Danieli did not document an extended examination of JW's musculoskeletal system, despite the fact that – to the extent JW had any complaints at all as the result of her automobile accident – they were limited to minor musculoskeletal complaints.

(x)       On or about March 6, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade billed GEICO under CPT code 99203 for an initial examination that Sanon purported to provide to an Insured named SJ at Florida Spine-North Miami, and thereby represented that they had provided a "detailed" physical examination to SJ. However, Sanon did not document an extended examination of SJ's musculoskeletal system, despite the fact that – to the extent SJ had any complaints at all as the result of her automobile accident – they were limited to minor musculoskeletal complaints.

(xi)      On or about March 28, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit billed GEICO under CPT code 99203 for an initial examination that White purported to provide to an Insured named CC at Florida Spine-West Hollywood, and thereby represented that they had provided a "detailed" physical examination to CC. However, White did not document an extended examination of CC's musculoskeletal system, despite the fact that – to the

extent CC had any complaints at all as the result of her automobile accident – they were limited to minor musculoskeletal complaints.

(xii)     On or about April 12, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg billed GEICO under CPT code 99203 for an initial examination that Amar purported to provide to an Insured named AP at Florida Spine-Kendall, and thereby represented that they had provided a "detailed" physical examination to AP. However, Amar did not document an extended examination of AP's musculoskeletal system, despite the fact that – to the extent AP had any complaints at all as the result of her automobile accident – they were limited to minor musculoskeletal complaints.

(xiii)    On or about May 22, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO under CPT code 99203 for an initial examination that Lopez purported to provide to an Insured named LT at Florida Spine-West Broward, and thereby represented that they had provided a "detailed" physical examination to LT. However, Lopez did not document an extended examination of LT's musculoskeletal system, despite the fact that – to the extent LT had any complaints at all as the result of his automobile accident – they were limited to minor musculoskeletal complaints.

(xiv)     On or about June 12, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO under CPT code 99203 for an initial examination that Lopez purported to provide to an Insured named MJ at Florida Spine-West Broward, and thereby represented that they had provided a "detailed" physical examination to MJ. However, Lopez did not document an extended examination of MJ's musculoskeletal system, despite the fact that – to the extent MJ had any complaints at all as the result of his automobile accident – they were limited to minor musculoskeletal complaints.

(xv)      On or about June 21, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO under CPT code 99203 for an initial examination that Lopez purported to provide to an Insured named JF at Florida Spine-West Broward, and thereby represented that they had provided a "detailed" physical examination to JF. However, Lopez did not document an extended examination of JF's musculoskeletal system, despite the fact that – to the extent JF had any complaints at all as the result of his automobile accident – they were limited to minor musculoskeletal complaints.

(xvi)     On or about June 21, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO under CPT code 99203 for an initial examination that Lopez purported to provide to an Insured named GT at Florida Spine-West Broward, and thereby represented that they had provided a "detailed" physical examination to GT. However, Lopez did not document an extended examination of GT's musculoskeletal system, despite the fact that – to the extent GT had any complaints at all as the result of his automobile accident – they

were limited to minor musculoskeletal complaints.

(xvii) On or about June 21, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO under CPT code 99203 for an initial examination that Lopez purported to provide to an Insured named AM at Florida Spine-West Broward, and thereby represented that they had provided a "detailed" physical examination to AM. However, Lopez did not document an extended examination of AM's musculoskeletal system, despite the fact that – to the extent AM had any complaints at all as the result of her automobile accident – they were limited to minor musculoskeletal complaints.

(xviii) On or about June 28, 2019, Florida Spine, TCFII, Feder, Fulcher, Brockelman, Englander, and Warheit billed GEICO under CPT code 99203 for an initial examination that Englander purported to provide to an Insured named WD at Florida Spine-Pompano, and thereby represented that they had provided a "detailed" physical examination to WD. However, Englander did not document an extended examination of WD's musculoskeletal system, despite the fact that – to the extent WD had any complaints at all as the result of her automobile accident – they were limited to minor musculoskeletal complaints.

(xix) On or about July 3, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO under CPT code 99203 for an initial examination that Lopez purported to provide to an Insured named GJ at Florida Spine-West Broward, and thereby represented that they had provided a "detailed" physical examination to GJ. However, Lopez did not document an extended examination of GJ's musculoskeletal system, despite the fact that – to the extent GJ had any complaints at all as the result of his automobile accident – they were limited to minor musculoskeletal complaints.

(xx) On or about July 15, 2019, Florida Spine, TCFII, Feder, Fulcher, Brockelman, Englander, and Warheit billed GEICO under CPT code 99203 for an initial examination that Englander purported to provide to an Insured named JO at Florida Spine-Pompano, and thereby represented that they had provided a "detailed" physical examination to JO. However, Englander did not document an extended examination of JO's musculoskeletal system, despite the fact that – to the extent JO had any complaints at all as the result of her automobile accident – they were limited to minor musculoskeletal complaints.

227. These are only representative examples. In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, and the Chiropractic Defendants routinely falsely represented that they had provided "detailed" physical examinations. In fact, they had not provided

detailed physical examinations because the examining physicians, physician assistants, and chiropractors had not documented an extended examination of the Insureds' affected body areas and other symptomatic or related organ systems.

228.    In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, and the Chiropractic Defendants falsely represented that they had provided "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at a higher rate than examinations that do not require the examining physician, physician assistant, or chiropractor to provide "detailed" physical examinations.

**d.     Misrepresentations Regarding the Extent of Medical Decision-Making**

229.    Furthermore, pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician, physician assistant, or chiropractor who performed the examination engaged in legitimate, "low complexity" medical decision-making.

230.    In this context, pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

231.    As set forth above, and in Exhibit "1", virtually all of the initial examinations that were billed through Florida Spine to GEICO were billed under CPT code 99203, which represented

that the examining physicians, physician assistants, or chiropractors engaged in some genuine, low-complexity medical decision-making during the initial examinations.

232. In actuality, however, the purported initial examinations did not involve any legitimate medical decision-making at all.

233. First, in the claims for initial examinations identified in Exhibit "1", the initial examinations routinely did not involve the retrieval, review, or analysis of a significant amount of medical records, diagnostic tests, or other information.

234. When the Insureds in the claims identified in Exhibit "1" presented to the Florida Spine clinics for "treatment", they did not arrive with any significant amount of medical records.

235. Second, in the claims for initial examinations identified in Exhibit "1", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

236. Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided at the Florida Spine clinics, to the extent that the Florida Spine clinics provided any such diagnostic procedures or treatment options in the first instance.

237. In virtually every one of the claims identified in Exhibit "1", any diagnostic procedures and "treatments" that the Florida Spine clinics actually provided were limited to a series of medically unnecessary follow-up examinations, chiropractic treatments, physical therapy treatments, and – less frequently – pain management injections, none of which was health- or life-threatening if properly administered.

238.    Third, in the claims for initial examinations identified in Exhibit "1", the examining physicians, physician assistants, or chiropractors did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

239.    Rather, to the extent that the initial examinations were conducted in the first instance, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, and the Chiropractic Defendants provided a nearly identical, pre-determined "diagnosis" for the Insureds, and prescribed a substantially similar course of treatment for the Insureds.

240.    Specifically, in the claims identified in Exhibit "1", during the initial examinations the Insureds routinely did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

241.    Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, and the Chiropractic Defendants prepared initial examination reports in which they provided phony, boilerplate sprain/strain "diagnoses" to virtually every Insured.

242.    Then, based upon these phony "diagnoses", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, and the Chiropractic Defendants directed virtually every Insured to receive significant and medically unnecessary physical therapy treatment.

243.    For example:

(i)     On January 8, 2019, an Insured named MD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MD's vehicle did not deploy, and that MD's vehicle was drivable following the accident. The police report further indicated that MD was not seriously injured in the accident. In keeping with the fact that MD was not seriously injured in the accident, MD did not visit any hospital emergency room following the accident. To the extent that

MD suffered any health problems at all as a result of the accident, they were of low severity. On January 16, 2019, Lopez purported to conduct an initial examination of MD at Florida Spine-West Broward. To the extent that Lopez performed the examination in the first instance, Lopez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lopez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lopez provided MD with substantially the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither MD's presenting problems, nor the treatment plan provided to MD by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit presented any risk of significant complications, morbidity, or mortality. To the contrary, MD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit consisted of medically unnecessary physical therapy services, which did not pose a significant risk to MD. Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Layton engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)     On January 11, 2019, an Insured named CT was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CT's vehicle did not deploy, and that CT's vehicle was drivable following the accident. The police report further indicated that CT was not injured in the accident. In keeping with the fact that CT was not seriously injured in the accident, CT did not visit any hospital emergency room following the accident. To the extent that CT suffered any health problems at all as a result of the accident, they were of low severity. On January 18, 2019, Englander purported to conduct an initial examination of CT at Florida Spine-Pompano. To the extent that Englander performed the examination in the first instance, Englander did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Englander did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Englander provided CT with substantially the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither CT's presenting problems, nor the treatment plan provided to CT by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit presented any risk of significant complications, morbidity, or mortality. To the contrary, CT did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit consisted of medically unnecessary physical therapy services, which did not pose a significant risk to CT. Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit billed GEICO for the initial examination using CPT code 99203, and

thereby falsely represented that Englander engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii)     On January 13, 2019, an Insured named NR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in NR's vehicle did not deploy, and that NR's vehicle was drivable following the accident. The police report further indicated that NR was not seriously injured in the accident. In keeping with the fact that NR was not seriously injured in the accident, NR did not visit any hospital emergency room following the accident. To the extent that NR suffered any health problems at all as a result of the accident, they were of low severity. On January 15, 2019, Englander purported to conduct an initial examination of NR at Florida Spine-Pompano. To the extent that Englander performed the examination in the first instance, Englander did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Englander did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Englander provided NR with substantially the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither NR's presenting problems, nor the treatment plan provided to NR by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit presented any risk of significant complications, morbidity, or mortality. To the contrary, NR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit consisted of medically unnecessary physical therapy services, which did not pose a significant risk to NR. Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Englander engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)     On January 13, 2019, an Insured named TA was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to TA's vehicle, that there was minor damage to the other vehicle, that the airbags in TA's vehicle did not deploy, and that TA's vehicle was drivable following the accident. The police report further indicated that TA was not injured in the accident. In keeping with the fact that TA was not seriously injured in the accident, TA did not visit any hospital emergency room following the accident. To the extent that TA suffered any health problems at all as a result of the accident, they were of low severity. On January 22, 2019, White purported to conduct an initial examination of TA at Florida Spine-Hialeah. To the extent that White performed the examination in the first instance, White did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, White did not consider any significant number of diagnoses or management options in connection with the examination. Instead, White provided TA with substantially the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured.

Furthermore, neither TA's presenting problems, nor the treatment plan provided to TA by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Tort-Saade presented any risk of significant complications, morbidity, or mortality. To the contrary, TA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Tort-Saade consisted of medically unnecessary physical therapy services, which did not pose a significant risk to TA. Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Tort-Saade billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that White engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v)     On January 23, 2019, an Insured named KC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in KC's vehicle did not deploy, and that KC's vehicle was drivable following the accident. The police report further indicated that KC was not injured in the accident. In keeping with the fact that KC was not seriously injured in the accident, KC did not visit any hospital emergency room following the accident. To the extent that KC suffered any health problems at all as a result of the accident, they were of low severity.  On January 28, 2019, Amar purported to conduct an initial examination of KC at Florida Spine-Kendall. To the extent that Amar performed the examination in the first instance, Amar did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Amar did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Amar provided KC with substantially the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither KC's presenting problems, nor the treatment plan provided to KC by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg presented any risk of significant complications, morbidity, or mortality. To the contrary, KC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg consisted of medically unnecessary physical therapy services, which did not pose a significant risk to KC. Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Amar engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi)     On February 11, 2019, an Insured named TJ was involved in an automobile accident. The contemporaneous police report indicated that there was no damage to TJ's vehicle, that there was no damage to the other vehicle, that the airbags in TJ's vehicle did not deploy, and that TJ's vehicle was drivable following the accident. The police report further indicated that TJ was not seriously injured in the accident. In keeping with the fact that TJ was not seriously injured in the accident, TJ did not visit any hospital following the accident. To the extent that TJ suffered

any health problems at all as a result of the accident, they were of low severity. On February 12, 2019, White purported to conduct an initial examination of TJ at Florida Spine-West Hollywood. To the extent that White performed the examination in the first instance, White did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, White did not consider any significant number of diagnoses or management options in connection with the examination. Instead, White provided TJ with substantially the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither TJ's presenting problems, nor the treatment plan provided to TJ by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit presented any risk of significant complications, morbidity, or mortality. To the contrary, TJ did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit consisted of medically unnecessary physical therapy services, which did not pose a significant risk to TJ. Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that White engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vii)     On February 13, 2019, an Insured named SC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in SC's vehicle did not deploy, and that SC's vehicle was drivable following the accident. The police report further indicated that SC was not injured in the accident. In keeping with the fact that SC was not seriously injured in the accident, SC did not visit any hospital emergency room following the accident. To the extent that SC suffered any health problems at all as a result of the accident, they were of low severity. On February 20, 2019, Sanon purported to conduct an initial examination of SC at Florida Spine-North Miami. To the extent that Sanon performed the examination in the first instance, Sanon did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sanon did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sanon provided SC with substantially the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither SC's presenting problems, nor the treatment plan provided to SC by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade presented any risk of significant complications, morbidity, or mortality. To the contrary, SC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade consisted of medically unnecessary physical therapy services, which did not pose a significant risk to SC. Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented

that Sanon engaged in some legitimate, low complexity medical decision-making during the purported examination.

(viii)   On March 5, 2019, an Insured named SJ was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to SJ's vehicle, that there was minor damage to the other vehicle, that the airbags in SJ's vehicle did not deploy, and that SJ's vehicle was drivable following the accident. The police report further indicated that SJ was not injured in the accident. In keeping with the fact that SJ was not seriously injured in the accident, SJ did not visit any hospital emergency room following the accident. To the extent that SJ suffered any health problems at all as a result of the accident, they were of low severity. On March 6, 2019, Sanon purported to conduct an initial examination of SJ at Florida Spine-North Miami. To the extent that Sanon performed the examination in the first instance, Sanon did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sanon did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sanon provided SJ with substantially the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither SJ's presenting problems, nor the treatment plan provided to SJ by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade presented any risk of significant complications, morbidity, or mortality. To the contrary, SJ did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade consisted of medically unnecessary physical therapy services, which did not pose a significant risk to SJ. Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Sanon engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ix)   On April 19, 2019, an Insured named RB was involved in an automobile accident. The contemporaneous police report indicated that the airbags in RB's vehicle did not deploy, and that RB's vehicle was drivable following the accident. The police report further indicated that RB was not seriously injured in the accident. In keeping with the fact that RB was not seriously injured in the accident, RB did not visit any hospital emergency room following the accident. To the extent that RB suffered any health problems at all as a result of the accident, they were of low severity. On May 1, 2019, Sanon purported to conduct an initial examination of RB at Florida Spine-North Miami. To the extent that Sanon performed the examination in the first instance, Sanon did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sanon did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sanon provided RB with substantially the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither

RB's presenting problems, nor the treatment plan provided to RB by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade presented any risk of significant complications, morbidity, or mortality. To the contrary, RB did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade consisted of medically unnecessary physical therapy services, which did not pose a significant risk to RB. Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Sanon engaged in some legitimate, low complexity medical decision-making during the purported examination.

(x)   On May 15, 2019, an Insured named LT was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to LT's vehicle, that there was minor damage to the other vehicle, that the airbags in LT's vehicle did not deploy, and that LT's vehicle was drivable following the accident. The police report further indicated that LT was not injured in the accident. In keeping with the fact that LT was not seriously injured in the accident, LT did not visit any hospital emergency room following the accident. To the extent that LT suffered any health problems at all as a result of the accident, they were of low severity.  On May 22, 2019, Lopez purported to conduct an initial examination of LT at Florida Spine-West Broward. To the extent that Lopez performed the examination in the first instance, Lopez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lopez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lopez provided LT with substantially the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither LT's presenting problems, nor the treatment plan provided to LT by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit presented any risk of significant complications, morbidity, or mortality. To the contrary, LT did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit consisted of medically unnecessary physical therapy services, which did not pose a significant risk to LT. Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lopez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xi)   On June 10, 2019, an Insured named MJ was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MJ's vehicle did not deploy, and that MJ's vehicle was drivable following the accident. The police report further indicated that MJ was not injured in the accident. In keeping with the fact that MJ was not seriously injured in the accident, MJ did not visit any hospital emergency room following the accident. To the extent that MJ suffered any health

problems at all as a result of the accident, they were of low severity. On June 12, 2019, Lopez purported to conduct an initial examination of MJ at Florida Spine-West Broward. To the extent that Lopez performed the examination in the first instance, Lopez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lopez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lopez provided MJ with substantially the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither MJ's presenting problems, nor the treatment plan provided to MJ by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit presented any risk of significant complications, morbidity, or mortality. To the contrary, MJ did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit consisted of medically unnecessary physical therapy services, which did not pose a significant risk to MJ. Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lopez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xii) On June 16, 2019, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to AM's vehicle, that the airbags in AM's vehicle did not deploy, and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured in the accident. In keeping with the fact that AM was not seriously injured in the accident, AM did not visit any hospital emergency room following the accident. To the extent that AM suffered any health problems at all as a result of the accident, they were of low severity. On June 21, 2019, Lopez purported to conduct an initial examination of AM at Florida Spine-West Broward. To the extent that Lopez performed the examination in the first instance, Lopez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lopez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lopez provided AM with substantially the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither AM's presenting problems, nor the treatment plan provided to AM by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit presented any risk of significant complications, morbidity, or mortality. To the contrary, AM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit consisted of medically unnecessary physical therapy services, which did not pose a significant risk to AM. Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for the initial examination using CPT code 99203, and

thereby falsely represented that Lopez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xiii)    On June 16, 2019, an Insured named GT was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to GT's vehicle, that the airbags in GT's vehicle did not deploy, and that GT's vehicle was drivable following the accident. The police report further indicated that GT was not injured in the accident. In keeping with the fact that GT was not seriously injured in the accident, GT did not visit any hospital emergency room following the accident. To the extent that GT  suffered any health problems at all as a result of the accident, they were of low severity. On June 21, 2019, Lopez purported to conduct an initial examination of GT at Florida Spine-West Broward. To the extent that Lopez performed the examination in the first instance, Lopez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lopez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lopez provided GT with substantially the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither GT's presenting problems, nor the treatment plan provided to GT by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit presented any risk of significant complications, morbidity, or mortality. To the contrary, GT did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit consisted of medically unnecessary physical therapy services, which did not pose a significant risk to GT. Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lopez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xiv)    On June 19, 2019, an Insured named JF was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JF's vehicle did not deploy, and that JF's vehicle was drivable following the accident. The police report further indicated that JF was not injured in the accident. In keeping with the fact that JF was not seriously injured in the accident, JF did not visit any hospital emergency room following the accident. To the extent that JF suffered any health problems at all as a result of the accident, they were of low severity.  On June 21, 2019, Lopez purported to conduct an initial examination of  JF at Florida Spine-West Broward. To the extent that Lopez performed the examination in the first instance, Lopez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lopez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lopez provided  JF with substantially the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither JF's presenting problems, nor the treatment plan provided to  JF by Florida Spine,

TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit presented any risk of significant complications, morbidity, or mortality. To the contrary, JF did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit consisted of medically unnecessary physical therapy services, which did not pose a significant risk to JF. Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lopez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xv)     On June 29, 2019, an Insured named GJ was involved in an automobile accident. The contemporaneous police report indicated that the airbags in GJ's vehicle did not deploy. The police report further indicated that GJ was not injured in the accident. In keeping with the fact that GJ was not seriously injured in the accident, GJ did not visit any hospital emergency room following the accident. To the extent that GJ suffered any health problems at all as a result of the accident, they were of low severity. On July 3, 2019, Lopez purported to conduct an initial examination of GJ at Florida Spine-West Broward. To the extent that Lopez performed the examination in the first instance, Lopez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lopez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lopez provided GJ with substantially the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither GJ's presenting problems, nor the treatment plan provided to GJ by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit presented any risk of significant complications, morbidity, or mortality. To the contrary, GJ did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit consisted of medically unnecessary physical therapy services, which did not pose a significant risk to GJ. Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lopez engaged in some legitimate, low complexity medical decision-making during the purported examination.

244.     In legitimate clinical setting, when a patient presents with a soft tissue injury such as a sprain or strain arising from an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

245.     It generally is inappropriate to begin administering physical therapy to a patient with a soft tissue injury in the immediate aftermath of the injury, before the patient has first tried a more conservative course of rest, ice, compression, and – if applicable – elevation of the affected body part.

246.     Even so, in the claims identified in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, and the Chiropractic Defendants routinely directed Insureds to immediately begin a course of physical therapy often within days of their accident, or even on the same day of their accident, before the Insureds had first tried a more conservative course of rest, ice, compression, and – if applicable – elevation of the affected body part.

247.     Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, and the Chiropractic Defendants routinely directed Insureds to immediately begin a course of physical therapy often within days of their accidents, or even on the same day of their accidents, because their putative initial examinations involved no legitimate medical decision-making whatsoever, and had pre-determined outcomes.

248.     There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

249.     An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

250.     As set forth above, in the claims identified in Exhibit "1", virtually all of the Insureds who purportedly received treatment at the Florida Spine clinics were involved in

relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

251.    It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

252.    It is even more improbable – to the point of impossibility – that this would occur over and over again.

253.    It likewise is improbable – to the point of impossibility – that two or more Insureds involved in the minor automobile accidents in the claims identified in Exhibit "1" would present for an initial examination with substantially identical symptoms, and receive substantially identical diagnoses, on or about the <u>exact same date</u> after their underlying automobile accident, often many weeks or months after the accident.

254.    Even so, in keeping with the fact that these  putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, Amar, Danieli, Englander, Lopez, and Sanon frequently issued substantially identical, phony "diagnoses", on or around the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

255.    What is more, in many instances, two or more Insureds involved in the same minor automobile accident would routinely not only present for an initial examination on the exact same date, but would also present for their purported follow-up physical therapy treatment and follow-

up examinations on the exact same dates, and incredibly would often also complete their purported treatment on the exact same date.

256.   It is improbable – to the point of impossibility – that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would suddenly simultaneously be cured of their ailments on the exact same date, months after their motor vehicle accident.

257.   For example:

(i)   On July 12, 2018, two Insureds – CR and RR – were involved in the same automobile accident. Thereafter – incredibly – both CR and RR presented at Florida Spine-Hialeah for initial examinations by Hess on the exact same date, January 15, 2019. CR and RR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CR and RR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Fulcher, Brockelman, Hess, and Tort-Saade provided CR and RR with substantially identical sprain/strain "diagnoses".

(ii)   On December 3, 2018, two Insureds – DB and OR – were involved in the same automobile accident. Thereafter – incredibly – both DB and OR presented at Florida Spine-Lake Worth for initial examinations by Layton on the exact same date, January 8, 2019. DB and OR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DB and OR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Fulcher, Brockelman, Layton, and Hess provided DB and OR with substantially identical sprain/strain "diagnoses".

(iii)   On December 8, 2018, two Insureds – MF and NR – were involved in the same automobile accident. Thereafter – incredibly – both MF and NR presented at Florida Spine-Orlando for initial examinations by Rivera on the exact same date, January 29, 2019. MF and NR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MF and NR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Fulcher, Brockelman, Rivera, and Hess provided MF and NR with substantially identical sprain/strain "diagnoses".

(iv)    On December 18, 2018, two Insureds – AS and JS – were involved in the same automobile accident. Thereafter – incredibly – both AS and JS presented at Florida Spine-Kendall for initial examinations by Crocco on the exact same date, February 13, 2019. AS and JS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AS and JS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Crocco, and Greenberg provided AS and JS with substantially identical sprain/strain "diagnoses".

(v)    On December 29, 2018, three Insureds – HL, OL, and SL – were involved in the same automobile accident. Thereafter – incredibly – HL, OL, and SL all presented at Florida Spine-Kendall for initial examinations by Crocco on the exact same date, January 18, 2018. HL, OL, and SL were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that HL, OL, and SL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Crocco, and Greenberg provided HL, OL, and SL with substantially identical sprain/strain "diagnoses".

(vi)    On January 20, 2019, two Insureds – MF and PM – were involved in the same automobile accident. Thereafter – incredibly – both MF and PM presented at Florida Spine-Lake Worth for initial examinations by Rivera on the exact same date, April 8, 2019. MF and PM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MF and PM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Fulcher, Brockelman, Rivera, and Hess provided MF and PM with substantially identical sprain/strain "diagnoses".

(vii)    On January 22, 2019, two Insureds – BD and JJ – were involved in the same automobile accident. Thereafter – incredibly – both BD and JJ presented at Florida Spine-West Broward for initial examinations by Lopez on the exact same date, January 23, 2019. BD and JJ were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that BD and JJ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit provided BD and JJ with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them. What is more, and in keeping with the fact that the "diagnoses" and "treatment recommendations"

that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit were pre-determined and phony, BD and JJ both presented at Florida Spine-West Broward on at least 35 of the <u>exact</u> same dates over a five month period where they received substantially similar physical therapy treatment on virtually all of those dates. Moreover Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, Warheit, and other providers associated with Florida Spine stopped treating BD and JJ on the same day, May 22, 2019. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the five months when they purportedly were treating at Florida Spine.

(viii)   On February 1, 2019, two Insureds – IA and KA – were involved in the same automobile accident. Thereafter – incredibly – both IA and KA presented at Florida Spine-Kendall for initial examinations by Amar on the exact same date, February 11, 2019. IA and KA were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that IA and KA suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg provided IA and KA with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy to both of them.  What is more, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg were pre-determined and phony, IA and KA both presented at Florida Spine-Kendall on at least 14 of the <u>exact</u> same dates over a two month period where they received substantially similar physical therapy treatment on virtually all of those dates. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the two months when they purportedly were treating at Florida Spine.

(ix)   On February 27, 2019, two Insureds – KM and JS – were involved in the same automobile accident. Thereafter – incredibly – both KM and JS presented at Florida Spine-Pompano for initial examinations on the exact same date, March 5, 2019. KM and JS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that KM and JS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit provided KM and JS with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them. What is more, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit were pre-determined and phony, KM and JS both presented at Florida Spine-Kendall on at least 11 of the <u>exact</u> same dates over a one month period where they received substantially similar physical therapy treatment on virtually all of those

dates. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the time period when they purportedly were treating at Florida Spine.

(x)     On March 2, 2019, two Insureds – HJ and EJ – were involved in the same automobile accident. Thereafter – incredibly – both HJ and EJ presented at Florida Spine-Pompano for initial examinations on the exact same date, March 13, 2019. HJ and EJ were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that HJ and EJ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit provided HJ and EJ with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them. What is more, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit to HJ and EJ were pre-determined and phony, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit stopped treating HJ and EJ on the same day, March 18, 2019. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the period of time when they purportedly were treating at Florida Spine.

(xi)    On March 2, 2019, three Insureds – YB, EL, and AB – were involved in the same automobile accident. Thereafter – incredibly – YB, EL, and AB all presented at Florida Spine-Pompano for initial examinations by Englander on the exact same date, March 6, 2019. YB, EL, and AB were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that YB, EL, and AB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit provided YB, EL, and AB with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to all of them. What is more, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit provided to YB, EL, and AB were pre-determined and phony, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, Warheit, and other providers associated with Florida Spine stopped treating YB and AB on the same day, April 24, 2019. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the month and a half when they purportedly were treating at Florida Spine.

(xii)   On March 6, 2019, two Insureds – FD and NG – were involved in the same automobile accident. Thereafter – incredibly – both  FD and NG presented at Florida Spine-West Broward for initial examinations by Lopez on the exact same

date, March 7, 2019. FD and NG were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that FD and NG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez and Warheit provided FD and NG with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy and chiropractic treatment to both of them.

(xiii)   On March 8, 2019, two Insureds – BC and ML – were involved in the same automobile accident. Thereafter – incredibly – both BC and ML presented at Florida Spine-Fort Myers for initial examinations by Layton on the exact same date, July 10, 2019. BC and ML were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that BC and ML suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Layton, and Greenberg provided BC and ML with substantially identical sprain/strain "diagnoses".

(xiv)   On March 29, 2019, two Insureds – JP and AW – were involved in the same automobile accident. Thereafter – incredibly – both JP and AW presented at Florida Spine-Kendall for initial examinations by Amar on the exact same date, April 8, 2019. JP and AW were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JP and AW suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg provided JP and AW with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy and chiropractic treatment to both of them. What is more, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg were pre-determined and phony, JP and AW both presented at Florida Spine-Kendall on at least 7 of the <u>exact</u> same dates over a two month period where they received substantially similar physical therapy treatment on virtually all of those dates. Moreover, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, Greenberg, and other providers associated with Florida Spine stopped treating JP and AW on the same day, June 7, 2019. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the two months when they purportedly were treating at Florida Spine.

(xv)   On April 7, 2019, two Insureds – WD and MF – were involved in the same automobile accident. Thereafter – incredibly – both WD and MF presented at Florida Spine-Pompano for initial examinations by Englander on the exact same

date, June 28, 2019. WD and MF were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that WD and MF suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit provided WD and MF with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy and chiropractic treatment to both of them.

(xvi)    On April 14, 2019, two Insureds – CB and JB – were involved in the same automobile accident. Thereafter – incredibly – both CB and JB presented at Florida Spine-North Miami for initial examinations by Sanon on the exact same date, April 22, 2019. CB and JB were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CB and JB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade provided CB and JB with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them. What is more, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Tort-Saade were pre-determined and phony, CB and JB both presented at Florida Spine-North Miami on at least 14 of the exact same dates over a two month period where they received substantially similar physical therapy treatment on virtually all of those dates. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the two months when they purportedly were treating at Florida Spine.

(xvii)   On May 13, 2019, three Insureds – JC, JD, and JS – were involved in the same automobile accident. Thereafter – incredibly – JC, JD, and JS all presented at Florida Spine-Kendall for initial examinations by Amar on the exact same date, May 14, 2019. JC, JD, and JS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JC, JD, and JS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg provided JC, JD, and JS with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to all of them. What is more, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg stopped treating JC and JS on the exact same date, September 6, 2019. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the two months when they purportedly were treating at Florida Spine.

(xviii)  On May 26, 2019, two Insureds – TB and LR – were involved in the same automobile accident. Thereafter – incredibly – both TB and LR presented at Florida Spine-Margate for initial examinations by Danieli on the exact same date, May 30, 2019. TB and LR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that TB and LR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit provided TB and LR with substantially identical sprain/strain "diagnoses".

(xix)  On June 8, 2019, two Insureds – DD and WD – were involved in the same automobile accident. Thereafter – incredibly – both DD and WD presented at Florida Spine-North Miami for initial examinations by Sanon on the exact same date, June 24, 2019. DD and WD were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DD and WD suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade provided DD and WD with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them. What is more, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade were pre-determined and phony, DD and WD both presented at Florida Spine-North Miami on at least 26 of the <u>exact</u> same dates over a five month period where they received substantially similar physical therapy treatment on virtually all of those dates. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the five months when they purportedly were treating at Florida Spine. Moreover Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, Tort-Saade, and other providers associated with Florida Spine stopped treating DD and WD on the exact same date, September 9, 2019. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the five months when they purportedly were treating at Florida Spine.

(xx)  On June 9, 2019, two Insureds – SJ and DR– were involved in the same automobile accident. Thereafter – incredibly – both SJ and DR presented at Florida Spine-Fort Myers for initial examinations by Layton on the exact same date, August 7, 2019. SJ and DR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that SJ and DR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Layton, and Greenberg provided SJ and DR with substantially identical sprain/strain

"diagnoses".

(xxi) On August 16, 2019, three Insureds – HL, AP, and EP – were involved in the same automobile accident. Thereafter – incredibly –HL, AP, and EP all presented at Florida Spine-North Miami for initial examinations by Sanon on the exact same date, August 19, 2019. HL, AP, and EP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that HL, AP, and EP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade provided HL, AP, and EP with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to all of them.

(xxii) On August 30, 2019, two Insureds – YD and TS – were involved in the same automobile accident. Thereafter – incredibly – both YD and TS presented at Florida Spine-North Miami for initial examinations by Sanon on the exact same date, September 12, 2019. YD and TS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that YD and TS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade provided YD and TS with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy and chiropractic treatment to both of them. What is more, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade were pre-determined and phony, YD and TS both presented at Florida Spine-North Miami on at least 20 of the exact same dates over a one and a half month period where they received substantially similar physical therapy treatment on virtually all of those dates. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the one and a half months when they purportedly were treating at Florida Spine.

(xxiii) On August 31, 2019, two Insureds – MC and MP – were involved in the same automobile accident. Thereafter – incredibly – both MC and MP presented at Florida Spine-Margate for initial examinations by Danieli on the exact same date, September 3, 2019. MC and MP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MC and MP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit provided MC and MP with substantially identical sprain/strain "diagnoses".

(xxiv)  On September 11, 2019 two Insureds – HN and QN – were involved in the same automobile accident. Thereafter – incredibly – both HN and QN presented at Florida Spine-Coral Springs for initial examinations by Danieli on the exact same date, September 20, 2019. HN and QN were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that HN and QN suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit provided HN and QN with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy and chiropractic treatment to both of them.

(xxv)  On September 26, 2019, two Insureds – DK and LK – were involved in the same automobile accident. Thereafter – incredibly – both DK and LK presented at Florida Spine-Margate for initial examinations by Danieli on the exact same date, September 30, 2019. DK and LK were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DK and LK suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit provided DK and LK with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy and chiropractic treatment to both of them.

258.    These are only representative examples. In the claims for initial examinations that are identified in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, and the Chiropractic Defendants routinely inserted false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that they purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

259.    To the extent that the Insureds in the claims identified in Exhibit "1" ever had any genuine medical problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary sprains or strains of the back, neck, or extremities.

260.    The diagnosis and treatment of these ordinary sprains and strains did not require

any "low complexity" medical decision-making on the part of Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, the Chiropractic Defendants, or any other health care providers associated with Florida Spine.

261.    To the contrary, the initial examinations did not involve any legitimate medical decision-making at all, because the purported "results" of the examinations were pre-determined, phony, and designed to provide a false justification for the laundry-list of other Fraudulent Services that the Defendants purported to provide.

262.    In the claims for initial examinations identified in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, and the Chiropractic Defendants routinely falsely represented that the initial examinations involved medical decision-making of low complexity in order to provide a false basis to bill for the initial examinations under CPT code 99203, because CPT code 99203 is reimbursable at a higher rate than examinations that do not require low complexity medical decision-making.

263.    In the claims for initial examinations identified in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, and the Chiropractic Defendants routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)    the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)    Florida Spine never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

264.    In this context, Warheit, Hess, Greenberg, and Tort-Saade – who at all relevant times purported to serve as the "medical directors" of the Florida Spine clinics – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

265.    Had Warheit, Greenberg, Hess, and Tort-Saade actually fulfilled their statutory role as the medical directors at the Florida Spine clinics, they would have noted – among other things – that the Defendants routinely fraudulently represented in Florida Spine's billing that the putative initial examinations were legitimately and lawfully performed and billed to GEICO.

266.    Warheit, Hess, Greenberg, and Tort-Saade failed to do so, because they never actually served as legitimate medical directors at the Florida Spine clinics in the first instance.

**2.      The Fraudulent Charges for Follow-Up Examinations**

267.    In addition to their fraudulent initial examinations,  Florida Spine, TCFII, Feder, Hess, Fulcher, and Brockelman and – depending on the Florida Spine clinic at issue – Crocco, Layton, Warheit, Hess, Tort-Saade, Rivera, a/d/or one of the Chiropractic Defendants, purported to subject the Insureds in the claims identified in Exhibit "1" to multiple, fraudulent follow-up examination(s) during the course of their fraudulent treatment and billing protocol.

268.    As set forth in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, Amar, Englander, Lopez, and Sanon then routinely billed the follow-up examinations to GEICO under CPT code 99213, virtually always resulting in charges ranging from $193.00 to $500.00 for each follow-up examination they purported to provide.

269.    In the claims for follow-up examinations identified in Exhibit "1", the charges for the follow-up examinations were fraudulent in that they misrepresented Florida Spine's eligibility to collect PIP Benefits in the first instance.

270.    In fact, and as set forth above, Florida Spine never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing requirements set forth in the Clinic Act.

271.    As set forth below, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, Amar, Englander, Lopez, and Sanon's charges for the follow-up examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature and extent of the follow-up examinations.

a.    **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

272.    Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

273.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination. For example:

(i)     Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)    Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)   Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)    Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)    Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)    Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

274.    Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

275.    By contrast, and as set forth above, to the limited extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their minor automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains.

276.    In keeping with the fact that the Insureds in the claims identified in Exhibit "1" almost never suffered any injuries more serious than garden-variety soft tissue injuries such as sprains and strains, in many of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents.

277.    To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain diagnosis.

278.    Furthermore, in the substantial majority of cases, contemporaneous police reports indicated that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

279.    Ordinary strains and sprains virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, or no treatment at all.

280.    By the time the Insureds in the claims identified in Exhibit "1" presented at the Florida Spine clinics for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their automobile accidents, or their presenting problems were minimal.

281.    Even so, in the claims for follow-up examinations identified in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, Amar, Englander, Lopez, and Sanon routinely billed for their putative follow-up examinations under CPT code 99213 and thereby falsely represented that the Insureds continued to suffer from presenting problems of low to moderate severity at the time of the purported follow-up examinations.

282.    For example:

(i)     On November 29, 2017, an Insured named BG was involved in an automobile accident. The contemporaneous police report indicated that BG was not seriously injured in the accident. In keeping with the fact that BG was not seriously injured in the accident, BG did not visit any hospital emergency room following the accident. To the extent that BG suffered any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of BG by Layton at Florida Spine-Kendall on June 20, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Layton, and Greenberg billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that BG presented with problems of low to moderate severity.

(ii)    On May 14, 2018, an Insured named SJ was involved in an automobile accident. The contemporaneous police report indicated  that the airbags in SJ's vehicle did not deploy, and that SJ's vehicle was drivable following the accident. The police report further indicated that SJ was not injured in the accident. In keeping with the fact that SJ was not seriously injured in the accident, SJ did not visit any hospital emergency room following the accident. To the extent that SJ suffered any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of SJ by Hess at Florida Spine-Coral Springs on January 10, 2019, Florida Spine, TCFII, Feder, Fulcher, Brockelman, Hess, and Warheit billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that SJ presented with problems of low to moderate

severity.

(iii)     On July 5, 2018, an Insured named OB was involved in an automobile accident. The contemporaneous police report indicated that that there was minor damage to the other vehicle, that the airbags in OB's vehicle did not deploy, and that OB's vehicle was drivable following the accident. The police report further indicated that OB was not injured in the accident. In keeping with the fact that OB was not seriously injured in the accident, OB did not visit any hospital emergency room following the accident. To the extent that OB suffered any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of OB by Warheit at Florida Spine-Coral Springs on May 24, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that OB presented with problems of low to moderate severity.

(iv)     On August 1, 2018, an Insured named AC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AC's vehicle did not deploy, and that AC's vehicle was drivable following the accident. The police report further indicated that AC was not injured in the accident. In keeping with the fact that AC was not seriously injured in the accident, AC did not visit any hospital emergency room following the accident. To the extent that AC suffered any health problems at all as a result of the accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of AC by Lopez at Florida Spine-West Broward on February 15, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that AC presented with problems of low to moderate severity. Subsequently, after an additional purported follow-up examination of AC by Layton at Florida Spine-Coral Springs on March 21, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Layton and Warheit billed GEICO for an additional follow-up examination using CPT code 99213 and thereby falsely represented that AC presented with problems of low to moderate severity.

(v)     On September 24, 2018, an Insured named KN was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to KN's vehicle, that there was minor damage to the other vehicle, that the airbags in KN's vehicle did not deploy, and that KN's vehicle was drivable following the accident. The police report further indicated that KN was not injured in the accident. In keeping with the fact that KN was not seriously injured in the accident, KN did not visit any hospital emergency room following the accident. To the extent that KN suffered any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of KN by Warheit at Florida Spine-Hialeah on January 9, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, and Tort-Saade billed GEICO for the

follow-up examination using CPT code 99213 and thereby falsely represented that KN presented with problems of low to moderate severity. Subsequently, after an additional purported follow-up examination of KN by Sanon at Florida Spine-North Miami on January 31, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade billed GEICO for an additional follow-up examination using CPT code 99213 and thereby falsely represented that KN presented with problems of low to moderate severity.

(vi)     On January 8, 2019, an Insured named MD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MD's vehicle did not deploy, and that MD's vehicle was drivable following the accident. The police report further indicated that MD was not seriously injured in the accident. In keeping with the fact that MD was not seriously injured in the accident, MD did not visit any hospital emergency room following the accident. To the extent that MD suffered any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of MD by Hess at Florida Spine-Coral Springs on February 7, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that MD presented with problems of low to moderate severity. Subsequently, after an additional purported follow-up examination of MD by Lopez at Florida Spine-West Broward on May 30, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for an additional follow-up examination using CPT code 99213 and thereby falsely represented that MD presented with problems of low to moderate severity.

(vii)    On January 8, 2019, an Insured named AC was involved in an automobile accident. The contemporaneous police report indicated that AC was not seriously injured in the accident. In keeping with the fact that AC was not seriously injured in the accident, AC did not visit any hospital emergency room following the accident. To the extent that AC suffered any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of AC by Rivera at Florida Spine-Kendall on February 19, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Rivera, and Greenberg billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that AC presented with problems of low to moderate severity. Subsequently, after an additional purported follow-up examination of AC by Amar at Florida Spine-Kendall on March 14, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg billed GEICO for an additional follow-up examination using CPT code 99213 and thereby falsely represented that AC presented with problems of low to moderate severity.

(viii)   On January 11, 2019, an Insured named CT was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CT's

vehicle did not deploy, and that CT's vehicle was drivable following the accident. The police report further indicated that CT was not injured in the accident. In keeping with the fact that CT was not seriously injured in the accident, CT did not visit any hospital emergency room following the accident. To the extent that CT suffered any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of CT by Hess at Florida Spine-Coral Springs on February 7, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that CT presented with problems of low to moderate severity. Subsequently, after an additional purported follow-up examination of CT by Englander at Florida Spine-Pompano on April 19, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander and Warheit billed GEICO for an additional follow-up examination using CPT code 99213 and thereby falsely represented that CT presented with problems of low to moderate severity.

(ix)   On January 13, 2019, an Insured named TA was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to TA's vehicle, that there was minor damage to the other vehicle, that the airbags in TA's vehicle did not deploy, and that TA's vehicle was drivable following the accident. The police report further indicated that TA was not injured in the accident. In keeping with the fact that TA was not seriously injured in the accident, TA did not visit any hospital emergency room following the accident. To the extent that TA suffered any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of TA by Rivera at Florida Spine-Hialeah on March 14, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Rivera, and Tort-Saade billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that TA presented with problems of low to moderate severity. Subsequently, after an additional purported follow-up examination of TA by Sanon at Florida Spine-North Miami on March 29, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade billed GEICO for an additional follow-up examination using CPT code 99213 and thereby falsely represented that TA presented with problems of low to moderate severity.

(x)    On January 13, 2019, an Insured named NR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in NR's vehicle did not deploy, and that NR's vehicle was drivable following the accident. The police report further indicated that NR was not seriously injured in the accident. In keeping with the fact that NR was not seriously injured in the accident, NR did not visit any hospital emergency room following the accident. To the extent that NR suffered any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of NR by Warheit

at Florida Spine-Coral Springs on February 26, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that NR presented with problems of moderate to high severity. Subsequently, after an additional purported follow-up examination of NR by Englander at Florida Spine-Pompano on April 19, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit billed GEICO for an additional follow-up examination using CPT code 99213 and thereby falsely represented that NR presented with problems of low to moderate severity.

(xi)     On January 23, 2019, an Insured named KC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in KC's vehicle did not deploy, and that KC's vehicle was drivable following the accident. The police report further indicated that KC was not injured in the accident. In keeping with the fact that KC was not seriously injured in the accident, KC did not visit any hospital emergency room following the accident. To the extent that KC suffered any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of KC by Crocco at Florida Spine-Kendall on April 17, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Crocco, and Greenberg billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that KC presented with problems of low to moderate severity.

(xii)    On February 11, 2019, an Insured named TJ was involved in an automobile accident. The contemporaneous police report indicated that there was no damage to TJ's vehicle, that there was no damage to the other vehicle, that the airbags in TJ's vehicle did not deploy, and that TJ's vehicle was drivable following the accident. The police report further indicated that TJ was not seriously injured in the accident. In keeping with the fact that TJ was not seriously injured in the accident, TJ did not visit any hospital emergency room following the accident. To the extent that TJ suffered any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of TJ by Warheit at Florida Spine-Coral Springs on March 21, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that TJ presented with problems of low to moderate severity.

(xiii)   On February 13, 2019, an Insured named SC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in SC's vehicle did not deploy, and that SC's vehicle was drivable following the accident. The police report further indicated that SC was not injured in the accident. In keeping with the fact that SC was not seriously injured in the accident, SC did not visit any hospital emergency room following the accident. To the extent that SC suffered any health problems at all as a result of the accident, they were of low or

minimal severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of SC by Amar at Florida Spine-Kendall on May 17, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that SC presented with problems of low to moderate severity

(xiv) On February 27, 2019, an Insured named HS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in HS's vehicle did not deploy, and that HS's vehicle was drivable following the accident. The police report further indicated that HS was not injured in the accident. In keeping with the fact that HS was not seriously injured in the accident, HS did not visit any hospital following the accident. To the extent that HS suffered any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of HS by Warheit at Florida Spine-Coral Springs on April 2, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that HS presented with problems of low to moderate severity.

(xv) On June 7, 2019, an Insured named CT was involved in an automobile accident. The contemporaneous police report indicated that CT's vehicle was drivable following the accident. The police report further indicated that CT was not seriously injured in the accident. In keeping with the fact that CT was not seriously injured in the accident, CT did not visit any hospital emergency room following the accident. To the extent that CT suffered any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of CT by Warheit at Florida Spine-Coral Springs on July 8, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that CT presented with problems of low to moderate severity. Subsequently, after an additional purported follow-up examination of CT by Lopez at Florida Spine-West Hollywood on August 14, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for an additional follow-up examination using CPT code 99213 and thereby falsely represented that CT presented with problems of low to moderate severity.

(xvi) On June 16, 2019, an Insured named GT was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to GT's vehicle, that the airbags in GT's vehicle did not deploy, and that GT's vehicle was drivable following the accident. The police report further indicated that GT was not injured in the accident. In keeping with the fact that GT was not seriously injured in the accident, GT did not visit any hospital emergency room following the accident. To the extent that GT suffered any health problems at all as a result of the

accident, they were of low or minimal severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of GT by Hess at Florida Spine-Coral Springs on July 18, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that GT presented with problems of low to moderate severity. Subsequently, after an additional purported follow-up examination of GT by Warheit at Florida Spine-Coral Springs on August 15, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit billed GEICO for an additional follow-up examination using CPT code 99213 and thereby falsely represented that GT presented with problems of low to moderate severity.

(xvii)   On June 29, 2019, an Insured named GJ was involved in an automobile accident. The contemporaneous police report indicated that the airbags in GJ's vehicle did not deploy. The police report further indicated that GJ was not seriously injured in the accident. In keeping with the fact that GJ was not seriously injured in the accident, GJ did not visit any hospital emergency room following the accident. To the extent that GJ suffered any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of GJ by Crocco at Florida Spine-Coral Springs on August 5, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Crocco, and Warheit billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that GJ presented with problems of low to moderate severity. Subsequently, after an additional purported follow-up examination of GJ by Warheit at Florida Spine-Coral Springs on September 24, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit billed GEICO for an additional follow-up examination using CPT code 99213 and thereby falsely represented that GJ presented with problems of low to moderate severity.

(xviii)   On June 10, 2019, an Insured named MJ was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MJ's vehicle did not deploy, and that MJ's vehicle was drivable following the accident. The police report further indicated that MJ was not injured in the accident. In keeping with the fact that MJ was not seriously injured in the accident, MJ did not visit any hospital emergency room following the accident. To the extent that MJ suffered any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of MJ by Layton at Florida Spine-Coral Springs on July 12, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Layton, and Warheit billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that MJ presented with problems of low to moderate severity.

(xix)   On June 24, 2019, an Insured named CJ was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CJ's vehicle did

not deploy, and that CJ's vehicle was drivable following the accident. The police report further indicated that CJ was not seriously injured in the accident. In keeping with the fact that CJ was not seriously injured in the accident, CJ did not visit any hospital emergency room following the accident. To the extent that CJ suffered any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had resolved within a few weeks of the accident. Even so, following a  purported follow-up examination of CJ by Warheit at Florida Spine-Coral Springs on August 20, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that CJ presented with problems of low to moderate severity. Subsequently, after an additional purported follow-up examination of CJ by Lopez at Florida Spine-West Hollywood on September 25, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for an additional follow-up examination using CPT code 99213 and thereby falsely represented that CJ presented with problems of low to moderate severity.

283.     These are only representative examples. In the claims for follow-up examinations identified in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, Amar, Englander, Lopez, and Sanon routinely falsely represented that the Insureds presented with problems of low to moderate severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

284.     In the claims for initial examinations identified in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, Amar, Englander, Lopez, and Sanon routinely falsely represented that the Insureds presented with problems of low to moderate severity  in order to create a false basis for their charges for the examinations under CPT code 99213 because follow-up examinations billable under CPT code 99213 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

285.    In the claims for follow-up examinations identified in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, Amar, Englander, Lopez, and Sanon also routinely falsely represented that the Insureds presented with problems of low to moderate severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**b.    Misrepresentations Regarding the Results of the Follow-Up Examinations**

286.    What is more, pursuant to the CPT Assistant, when Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, Amar, Englander, Lopez, and Sanon billed for their putative follow-up examinations under CPT code 99213, they represented that they provided and/or performed at least two of the following three components: (i) an "expanded problem focused" patient history; (ii) an "expanded problem focused physical examination"; and (iii) medical decision-making of "low complexity".

287.    In actuality, however, in the claims for follow-up examinations identified in Exhibit "1", no one recorded any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

288.    Rather, following their purported follow-up examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, Amar, Englander, Lopez, and Sanon simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either  (ii) referred the Insureds back to Florida Spine for even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services from Florida Spine that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

289.    In a legitimate clinical setting, each individual patient's physical therapy schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

290.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy.

291.    By contrast, at the Florida Spine clinics, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Defendants' fraudulent treatment and billing protocol.

292.    The phony "follow-up examinations" that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, Amar, Englander, Lopez, and Sanon purported to provide the Insureds in the claims identified in Exhibit "1" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were pre-determined to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into Florida Spine's offices.

293.    In the claims for follow-up examinations identified in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Crocco, Layton, Amar, Englander, Lopez, and Sanon routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)      the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)     the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)    As set forth herein, the Florida Spine clinics never were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

294.    In this context, Warheit, Greenberg, Hess, and Tort-Saade – who at all relevant times purported to serve as the "medical directors" of the Florida Spine clinics– did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

295.    Had Warheit, Greenberg, Hess, and Tort-Saade actually fulfilled their statutory role as the medical directors at the Florida Spine clinics, they would have noted – among other things – that the Defendants routinely fraudulently represented in Florida Spine's billing that the putative follow-up examinations were legitimately and lawfully performed.

296.    Warheit, Greenberg, Hess, and Tort-Saade failed to do so, because they never actually served as legitimate medical directors at the Florida Spine clinics in the first instance.

**c.      The Duplicative Charges for Follow-Up Examinations**

297.    As part of their fraudulent scheme, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, and the Chiropractic Defendants also submitted thousands of charges for follow-up examinations under CPT code 99211, typically resulting in charges of $77.00 or $84.00 for each such putative follow-up examination.

298.    As discussed in detail below, the Defendants purported to provide virtually every Insured with a course of in-office physical therapy treatment.

110

299.    The Defendants then billed the physical therapy services to GEICO using a variety of CPT codes.

300.    At the same time, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, and the Chiropractic Defendants routinely billed GEICO for multiple putative follow-up examinations under CPT code 99211 contemporaneous with their supposed provision of physical therapy treatment.

301.    However, these supposed "examinations" were never truly separate services from the putative physical therapy services.

302.    Instead, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, and the Chiropractic Defendants billed GEICO for illusory follow-up examinations under CPT code 99211 in order to maximize the fraudulent billing they submitted to GEICO.

303.    In keeping with the fact that the follow-up examinations purportedly provided contemporaneous with the physical therapy services were illusory, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, and the Chiropractic Defendants virtually never submitted any reports, notes, or any substantiating documentation whatsoever in connection with the phony follow-up examinations billed under CPT code 99211.

304.    Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, and the Chiropractic Defendants routinely submitted duplicative charges under CPT code 99211 for illusory follow-up examinations contemporaneous with charges for putative physical therapy services.

305.    For example:

(i)     Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg billed GEICO for purported follow-up examinations under CPT code 99211 that

were supposedly provided to an Insured named RP at Florida Spine-Kendall contemporaneous with physical therapy services purportedly provided on <u>fourteen separate dates</u> including January 7, 2019, January 8, 2019, January 9, 2019, January 15, 2019, January 16, 2019, January 21, 2019, January 22, 2019, January 25, 2019, January 31, 2019, February 1, 2019, February 6, 2019, February 7, 2019, February 8, 2019, and February 12, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(ii)     Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named JA at Florida Spine-Kendall contemporaneous with physical therapy services purportedly provided on <u>sixteen separate dates</u> including February 5, 2019, February 18, 2019, February 22, 2019, February 25, 2019, March 1, 2019, March 4, 2019, March 12, 2019, March 13, 2019, March 14, 2019, March 18, 2019, March 20, 2019, March 27, 2019, March 29, 2019, April 10, 2019, April 26, 2019, and May 6, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(iii)    Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named FB at Florida Spine-Kendall contemporaneous with physical therapy services purportedly provided on <u>eighteen separate dates</u> including March 12, 2019, March 14, 2019, March 18, 2019, March 20, 2019, April 1, 2019, April 3, 2019, April 5, 2019, April 8, 2019, April 10, 2019, April 15, 2019, April 19, 2019, April 24, 2019, April 25, 2019, April 29, 2019, May 8, 2019, May 10, 2019,  May 15, 2019, and May 20, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(iv)     Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named MP at Florida Spine-Kendall contemporaneous with physical therapy services purportedly provided on <u>thirteen separate dates</u> including, May 28, 2019, May 29, 2019,  June 6, 2019, June 13, 2019, June 19, 2019, June 26, 2019, June 28, 2019, July 8, 2019, July 9, 2019, July 19, 2019, July 22, 2019, July 24, 2019, and July 25, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and

Greenberg provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(v)     Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named CR at Florida Spine-Kendall contemporaneous with physical therapy services purportedly provided on <u>eleven separate dates</u> including, May 14, 2019, May 15, 2019, May 17, 2019, May 20, 2019, May 22, 2019, May 29, 2019, May 30, 2019, June 5, 2019, June 12, 2019, June 25, 2019, and July 3, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(vi)    Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named BR at Florida Spine-Kendall contemporaneous with physical therapy services purportedly provided on <u>six separate dates</u> including, July 1, 2019, July 3, 2019, July 9, 2019, July 10, 2019, August 6, 2019, and August 7, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, and Greenberg provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(vii)   Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named CA at Florida Spine-Margate contemporaneous with physical therapy services purportedly provided on <u>nineteen separate dates</u> including March 26, 2019, March 28, 2019, March 29, 2019, April 3, 2019, April 4, 2019, April 5, 2019, April 10, 2019, April 12, 2019, April 19, 2019, April 23, 2019, April 25, 2019, April 29, 2019, April 30, 2019, May 2, 2019, May 7, 2019,  May 14, 2019, May 16, 2019, May 17, 2019, and June 3, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(viii)  Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named MS at Florida Spine-Margate contemporaneous with physical therapy services purportedly provided on <u>fourteen separate dates</u> including July 5, 2019, July 9, 2019, July 11, 2019, July 16, 2019, July 18, 2019, July 23, 2019, July 25, 2019, August 6, 2019, August 13, 2019,

August 19, 2019, September 19, 2019, October 2, 2019, October 8, 2019, and October 15, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(ix)   Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named DT at Florida Spine-Margate contemporaneous with physical therapy services purportedly provided on seven separate dates including July 17, 2019, July 24, 2019, July 31, 2019, August 21, 2019, August 22, 2019, August 19, 2019, and September 3, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(x)    Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named AB at Florida Spine-Margate contemporaneous with physical therapy services purportedly provided on nineteen separate dates including July 3, 2019, July 5, 2019, July 8, 2019, July 11, 2019, July 12, 2019, July 15, 2019, July 17, 2019, July 22, 2019, July 24, 2019, July 26, 2019, July 29, 2019, July 31, 2019, August 5, 2019, August 7, 2019, August 9, 2019, August 13, 2019, August 16, 2019, August 19, 2019, and August 22, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(xi)   Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named AB at Florida Spine-Margate contemporaneous with physical therapy services purportedly provided on seventeen separate dates including January 3, 2019, January 7, 2019, January 10, 2019, January 11, 2019, January 14, 2019, January 17, 2019, January 18, 2019, January 22, 2019, January 24, 2019, January 28, 2019, January 31, 2019, February 4, 2019, February 7, 2019, February 8, 219, February 14, 2019, February 15, 2019, and February 21, 2019.   This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Danieli, and Warheit provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

114

(xii)    Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named AG at Florida Spine-Pompano contemporaneous with physical therapy services purportedly provided on <u>twenty separate dates</u> including March 7, 2019, March 8, 2019, March 11, 2019, March 12, 2019, March 13, 2019, March 14, 2019, March 15, 2019, March 18, 2019, March 19, 2019, March 20, 2019, March 25, 2019, March 28, 2019, March 29, 2019, April 8, 2019, April 9, 2019, April 11, 2019, April 15, 2019, April 17, 2019, April 18, 2019, and April 24, 2019, This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(xiii)    Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named VM at Florida Spine-Pompano contemporaneous with physical therapy services purportedly provided on <u>twenty separate dates</u> including September 5, 2019, September 6, 2019, September 9, 2019, September 10, 2019, September 11, 2019, September 12, 2019, September 13, 2019, September 16, 2019, September 17, 2019, September 18, 2019, September 19, 2019, September 25, 2019, September 26, 2019, September 27, 2019, September 30, 2019, October 2, 2019, October 4, 2019, October 7, 2019, October 11, 2019, and October 14, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(xiv)    Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named PB at Florida Spine-Pompano contemporaneous with physical therapy services purportedly provided on <u>twelve separate dates</u> including January 2, 2019, January 4, 2019, January 7, 2019, January 9, 2019, January 15, 2019, January 16, 2019, January 17, 2019, January 21, 2019, January 22, 2019, January 23, 2019, January 24, 2019, and January 28, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(xv)    Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named JD at Florida Spine-Pompano contemporaneous with physical therapy services purportedly provided on <u>eight</u>

separate dates including January 10, 2019, January 14, 2019, January 15, 2019, January 16, 2019, January 21, 2019, January 22, 2019, January 23, 2019, and January 24, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(xvi)   Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon and Tort-Saade billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named JB at Florida Spine-North Miami contemporaneous with physical therapy services purportedly provided on seven separate dates including April 26, 2019, April 29, 2019, April 30, 2019, May 1, 2019, May 2, 2019, May 6, 2019, and May 8, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(xvii)  Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named DA at Florida Spine-West Broward contemporaneous with physical therapy services purportedly provided on twelve separate dates including January 16, 2019, January 21, 2019, January 24, 2019, January 25, 2019 January 28, 2019, January 29, 201,  February 1, 2019, February 4, 2019, February 5, 2019, February 6, 2019, February 8, 2019, and February 13, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(xviii) Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named DA at Florida Spine-West Hollywood contemporaneous with physical therapy services purportedly provided on nine separate dates including August 14, 2019, August 19, 2019, August 21, 2019, September 10, 2019, September 16, 2019, September 19, 2019, October 2, 2019, October 8, 2019, and October 15, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(xix)   Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for purported follow-up examinations under CPT code 99211 that were

supposedly provided to an Insured named KH at Florida Spine-West Broward contemporaneous with physical therapy services purportedly provided on <u>fifteen separate dates</u> including February 5, 2019, February 13, 2019, February 19, 2019, February 25, 2019, February 26, 2019, March 6, 2019, March 22, 2019, April 4, 2019, April 11, 2019, April 12, 2019, April 18, 2019, April 22, 2019, May 3, 2019, May 8, 2019, and May 15, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(xx)   Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named VB at Florida Spine-West Broward contemporaneous with physical therapy services purportedly provided on <u>twelve separate dates</u> including January 4, 2019, January 11, 2019, January 15, 2019, January 22, 2019, February 1, 2019, February 5, 2019, February 6, 2019, February 19, 2019, February 21, 2019, February 27, 2019, March 1, 2019, and March 5, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Lopez, and Warheit provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(xxi)  Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named MA at Florida Spine-North Miami contemporaneous with physical therapy services purportedly provided on <u>eleven separate dates</u> including January 24, 2019, January 28, 2019, February 1, 2019, February 5, 2019, February 6, 2019, February 8, 2019, February 11, 2019, February 15, 2019, February 20, 2019, February 22, 2019, and March 1, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(xxii)  Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named JA at Florida Spine-North Miami contemporaneous with physical therapy services purportedly provided on <u>sixteen separate dates</u> including June 14, 2019, June 17, 2019, June 21, 2019, July 1, 2019, August 12, 2019, August 26, 2019, August 29, 2019, September 5, 2019, September 13, 2019, September 18, 2019, September 24, 2019, October, 1, 2019, October 3, 2019, October 9, 2019, October 10, 2019, and October 16, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon,

and Tort-Saade provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(xxiii)   Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named LM at Florida Spine-North Miami contemporaneous with physical therapy services purportedly provided on <u>ten separate dates</u> including October 1, 2019, October 2, 2019, October 3, 2019, October 7, 2019, October 9, 2019, October 10, 2019, October 14, 2019, October 15, 2019, October 16, 2019, and October 24, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(xxiv)   Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named CM at Florida Spine-North Miami contemporaneous with physical therapy services purportedly provided on <u>sixteen separate dates</u> including June 10, 2019, June 11, 2019, June 12, 2019, June 13, 2019, June 17, 2019, June 18, 2019, June 19, 2019, June 20, 2019, June 24, 2019, June 25, 2019, June 26, 2019, July 1, 2019, July 2, 2019, July 3, 2019, July 8, 2019, and July 9, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(xxv)   Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named JS at Florida Spine-North Miami contemporaneous with physical therapy services purportedly provided on <u>fourteen separate dates</u> including April 22, 2019, April 25, 2019, April 26, 2019, May 1, 2019, May 2, 2019, May 3, 2019, May 6, 2019, May 10, 2019, May 13, 2019, May 16, 2019, May 22, 2019, May 23, 2019, May 24, 2019, and May 31, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(xxvi)   Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named GC at Florida Spine-West Hollywood contemporaneous with physical therapy services purportedly provided on <u>seventeen separate dates</u> including January 8, 2019, January 9, 2019, January 10,

2019, January 11, 2019, January 5, 2019, January 16, 2019, January 17, 2019, January 18, 2019, January 29, 2019, February 6, 2019, February 8, 2019, February 14, 2019, February 19, 2019, February 21, 2019, February 22, 2019, February 28, 2019, March 1, 2019, and March 8, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(xxvii) Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named VC at Florida Spine-West Hollywood contemporaneous with physical therapy services purportedly provided on <u>fourteen separate dates</u> including February 4, 2019, February 6, 2019, February 7, 2019, February 8, 2019, February 11, 2019, February 13, 2019, February 20, 2019, February 21, 2019, February 25, 2019, February 27, 2019, March 4, 2019, March 14, 2019, March 19, 2019, and March 25, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(xxviii) Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named KB at Florida Spine-West Hollywood contemporaneous with physical therapy services purportedly provided on <u>twelve separate dates</u> including February 4, 2019, February 27, 2019, March 1, 2019, March 4, 2019, March 6, 2019, March 8, 2019, March 13, 2019, March 14, 2019, March 18, 2019, March 19, 2019, March 25, 2019, and April 5, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(xxix) Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named TJ at Florida Spine-West Hollywood contemporaneous with physical therapy services purportedly provided on <u>thirteen separate dates</u> including February 13, 2019, February 14, 2019, February 20, 2019, February 21, 2019, February 28, 2019, March 5, 2019, March 6, 2019, March 8, 2019, March 12, 2019, March 13, 2019, March 19, 2019, March 26, 2019, and March 27, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(xxx) Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named LS at Florida Spine-West Hollywood contemporaneous with physical therapy services purportedly provided on eleven separate dates including March 20, 2019, April 12, 2019, April 15, 2019, April 16, 2019, April 17, 2019, April 18, 2019, April 22, 2019, April 23, 2019, April 24, 2019, April 25, 2019, and April 26, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, and Warheit provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

306.    These are only representative examples. Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, the Chiropractic Defendants, and other providers associated with Florida Spine routinely submitted charges for illusory follow-up examinations under CPT code 99211.

307.    Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, the Chiropractic Defendants, and other providers associated with Florida Spine submitted charges for the illusory follow-up examinations in order to maximize the amount of fraudulent billing they could submit to insurers, including GEICO.

**3.      The Fraudulent Charges for Physical Therapy Services**

308.    In addition to the fraudulent initial examinations and follow-up examinations, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, and the Chiropractic Defendants virtually always purported to subject the Insureds in the claims identified in Exhibit "1" to unnecessary physical therapy.

309.    As set forth above, though the Chiropractic Defendants and other chiropractors associated with Florida Spine falsely purported to personally perform or directly supervise virtually all of the physical therapy services in the claims identified in Exhibit "1", the physical therapy services actually were routinely performed without supervision by massage therapists

associated with Florida Spine, to the extent that they were even provided at all.

310.     As set forth in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, and the Chiropractic Defendants then billed the purported physical therapy services to GEICO under:

(i)     CPT code 97010, for putative hot/cold pack application, resulting in a charge of $60.00 for each round of hot/cold pack therapy they purported to provide;

(ii)    CPT code 97012, for putative mechanical traction therapy, resulting in charges ranging from $55.00 to $60.00 for each round of mechanical traction they purported to provide;

(iii)   CPT code 97035, for putative ultrasound, resulting in charges ranging from $44.00 to $48.00 for each round of ultrasound they purported to provide;

(iv)    CPT code 97039, for unlisted modality treatments, resulting in charges ranging from $44.00 to $48.00 for each round of unlisted modality treatments they purported to provide;

(v)     CPT code 97110, for putative therapeutic exercises, resulting in charges ranging from $77.00 to $84.00 for each round of therapeutic exercises they purported to provide;

(vi)    CPT code 97112, for putative neuromuscular reeducation, resulting in charges ranging from $77.00 to $84.00 for each round of neuromuscular reeducation they purported to provide;

(vii)   CPT code 97140, for putative manual therapy, resulting in charges ranging from $72.00 to $79.00 for each round of manual therapy they purported to provide;

(viii)  CPT code 97530 for putative therapeutic activities, resulting in charges ranging from $90.00 to $99.00 for each round of manual therapy they purported to provide; and

(ix)    Health Care Common Procedure Coding System ("HCCPCS") code G0283 for putative electric stimulation treatments, resulting in charges ranging from $44.00 to $48.00 for each round of electrical stimulation they purported to provide;

311.     In the claims for physical therapy services identified in Exhibit "1", the charges for the physical therapy services were fraudulent in that they misrepresented Florida Spine's eligibility to collect PIP Benefits in the first instance.

312.    In fact, and as set forth herein, Florida Spine never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

313.    In a legitimate clinical setting, the individual physical therapy services that are provided to an individual patient should be tailored to that patient's individual circumstances and presentation.

314.    In keeping with the fact that the purported physical therapy services that were billed through Florida Spine to GEICO were not medically necessary, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, and the Chiropractic Defendants did not tailor the physical therapy services they purported to provide to each Insured's individual circumstances and presentation.

315.    There are a large number of individual types of physical therapy services that potentially can be provided to a patient, depending on the patient's individual symptomatology and needs.

316.    However, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, and the Chiropractic Defendants routinely purported to provide the same handful of physical therapy "treatments" to the Insureds in the claims identified in Exhibit "1", on substantially the same schedule, without regard for the Insureds' individual circumstances.

317.    Specifically, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, and the Chiropractic Defendants purported to provide a significant portion of the Insureds in the claims identified in Exhibit "1" with substantially identical physical therapy consisting of ultrasound, hot/cold/compression treatments, therapeutic exercises, neuromuscular reeducation, manual therapy, and therapeutic activities. This, despite the fact that the Insureds were

differently situated, and could not possibly all have required a substantially-similar course of physical therapy.

318.    What is more, and as set forth above, in the claims for physical therapy services identified in Exhibit "1", Florida Spine falsely represented that the physical therapy services lawfully had been performed or directly supervised by the Chiropractic Defendants and other chiropractors associated with Florida Spine when in fact they were in most cases unlawfully performed without supervision by massage therapists associated with Florida Spine, who are not and never have been licensed as physical therapists or chiropractors.

319.    In each of the claims for physical therapy services identified in Exhibit "1", the Defendants falsely represented that the services were lawfully provided and eligible for PIP reimbursement.

320.    In fact, in the claims for physical therapy services identified in Exhibit "1", the services were not lawfully provided, inasmuch as: (i) the putative physical therapy services were performed – to the extent that they were performed at all – by unsupervised massage therapists associated with Florida Spine, who were individuals who were not licensed to practice physical therapy; and (ii) Florida Spine deliberately misrepresented the identities of the individuals who purported to perform the physical therapy services in their billing for the physical therapy services, in a calculated attempt to induce GEICO to pay the non-reimbursable charges.

**4.    The Fraudulent Charges for Pain Management Injections**

321.    As part and parcel of the Defendants' fraudulent scheme, Florida Spine subjected many Insureds to medically unnecessary pain management injections.

322.    Typically, Warheit and Rivera purported to perform the injections.

323.    As set forth in Exhibit "1", these pain management injections typically included: (i) epidural injections, which typically were billed to GEICO under CPT codes 62321, 62323, and 64483; and (ii) facet injections, which typically were billed to GEICO under CPT codes 64490, 64491, 64492, 64493, 64494, and 64495.

324.    As set forth below, the charges for pain management injections were fraudulent because the pain management injections were medically unnecessary and were provided – to the extent that they were provided at all – pursuant to the Defendants' pre-determined fraudulent treatment and billing protocol, and not to treat or otherwise benefit the Insureds who were subjected to it.

325.    Furthermore, the charges for pain management injections were fraudulent in that they misrepresented Florida Spine's eligibility to collect PIP Benefits in the first instance.

326.    In fact, and as set forth above, Florida Spine never was eligible to collect PIP Benefits, because it was operating in violation of the Clinic Act.

**a.      Basic, Legitimate Use of Pain Management Injections**

327.    Generally, when a patient presents with a soft tissue injury such as a sprain or strain secondary to an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

328.    If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.

329.    The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through this sort of conservative treatment, or no treatment at all.

330.    In a legitimate clinical setting, pain management injections should not be

administered until a patient has failed more conservative treatments, including chiropractic treatment, physical therapy, and pain management medication.

331.    This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and invasive interventional pain management procedures entail a degree of risk to the patient that is absent in conservative forms of treatment.

**b.    The Medically Unnecessary Pain Management Injections**

332.    However, in the claims for pain management injections identified in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Rivera, Warheit, Greenberg, and Tort-Saade purported to provide pain management injections to Insureds before the Insureds had tried and failed any course of legitimate, conservative treatment.

333.    For example:

(i)    On October 25, 2018, an Insured named MG was involved in an automobile accident. Florida Spine, TCFII, Feder, Hess, Rivera, and Greenberg purported to provide an epidural injection to MG at Florida Spine-Kendall on December 10, 2018 – less than two months after the accident – even though MG could not have failed conservative treatment less than two months after the purported automobile accident.

(ii)    On November 28, 2018, an Insured named QT was involved in an automobile accident. Florida Spine, Feder, Rivera, and Hess purported to provide an epidural injection to QT at Florida Spine-Orlando on December 18, 2018 – less than two months after the accident – even though QT could not have failed conservative treatment less than two months after the purported automobile accident.

(iii)    On December 3, 2018, an Insured named OR was involved in an automobile accident. Florida Spine, TCFII, Feder, Fulcher, Brockelman, Rivera, and Hess purported to provide an epidural injection to OR at Florida Spine-Lake Worth on January 17, 2019 – less than two months after the accident – even though OR could not have failed conservative treatment less than two months after the purported automobile accident.

(iv)    On December 3, 2018, an Insured named JA was involved in an automobile accident. Florida Spine, TCFII, Feder, Fulcher, Brockelman, Rivera, and Hess

purported to provide an epidural injection to JA at Florida Spine-Orlando on January 14, 2019 – less than two months after the accident – even though JA could not have failed conservative treatment less than two months after the purported automobile accident.

(v)   On December 5, 2018, an Insured named MF was involved in an automobile accident. Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit purported to provide an epidural injection to MF at Florida Spine-Coral Springs on January 17, 2019 – less than two months after the accident – even though MF could not have failed conservative treatment less than two months after the purported automobile accident. Then, two weeks after that, on February 1, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit purported to provide an additional epidural injection to Miles Floyd at Florida Spine-Coral Springs.

(vi)   On December 13, 2018, an Insured named PH was involved in an automobile accident. Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit purported to provide an epidural injection to PH at Florida Spine-Coral Springs on February 7, 2019 – less than two months after the accident – even though PH could not have failed conservative treatment less than two months after the purported automobile accident. Then, three weeks after that, on February 28, 2019, Florida Spine, TCFII, Feder, Fulcher, Brockelman, and Warheit purported to provide an additional epidural injection to PH at Florida Spine-Coral Springs.

(vii)   On December 27, 2018, an Insured named KD was involved in an automobile accident. Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Rivera, and Tort-Saade purported to provide an epidural injection to KD at Florida Spine-Hialeah on February 21, 2019 – less than two months after the accident – even though KD could not have failed conservative treatment less than two months after the purported automobile accident.

(viii)   On January 8, 2019, an Insured named FC was involved in an automobile accident. Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Rivera, and Greenberg purported to provide multiple facet injections to FC at Florida Spine-Kendall on February 28, 2019 – less than two months after the accident – even though FC could not have failed conservative treatment less than two months after the purported automobile accident. Then, six weeks after that, on April 10, 2019, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Rivera, and Greenberg purported to provide multiple facet injections to FC at Florida Spine-Kendall.

(ix)   On January 31, 2019, an Insured named HA was involved in an automobile accident. Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit purported to provide an epidural injection to HA at Florida Spine-Coral Springs on March 14, 2019 – less than two months after the accident – even though HA could not have failed conservative treatment less than two months after the purported automobile accident.

(x)    On February 1, 2019, an Insured named HG was involved in an automobile accident. Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit purported to provide an epidural injection to HG at Florida Spine-Coral Springs on February 26, 2019 – less than two months after the accident – even though HG could not have failed conservative treatment less than two months after the purported automobile accident.

(xi)    On February 11, 2019, an Insured named KF was involved in an automobile accident. Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit purported to provide an epidural injection to KF at Florida Spine-Coral Springs on April 5, 2019 – less than two months after the accident – even though KF could not have failed conservative treatment less than two months after the purported automobile accident.

(xii)    On February 27, 2019, an Insured named JW was involved in an automobile accident. Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit purported to provide an epidural injection to JW at Florida Spine-Coral Springs on April 18, 2019 – less than two months after the accident – even though JW could not have failed conservative treatment less than two months after the purported automobile accident.

(xiii)    On April 2, 2019, an Insured named RG was involved in an automobile accident. Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit purported to provide an epidural injection to RG at Florida Spine-Coral Springs on May 31, 2019 – less than two months after the accident – even though RG could not have failed conservative treatment less than two months after the purported automobile accident.

(xiv)    On April 10, 2019, an Insured named NL was involved in an automobile accident. Florida Spine, TCFII, Feder, Fulcher, Brockelman, Rivera, and Hess purported to provide multiple facet injections to NL at Florida Spine-Orlando on May 28, 2019 – less than two months after the accident – even though NL could not have failed conservative treatment less than two months after the purported automobile accident.

(xv)    On April 14, 2019, an Insured named VR was involved in an automobile accident. Florida Spine, TCFII, Feder, Fulcher, Brockelman, Rivera, and Hess purported to provide multiple facet injections to VR at Florida Spine-Orlando on April 29, 2019 – less than two months after the accident – even though VR could not have failed conservative treatment less than two months after the purported automobile accident.

(xvi)    On April 15, 2019, an Insured named SE was involved in an automobile accident. Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit purported to provide an epidural injection to SE at Florida Spine-Coral Springs on May 16, 2019 – less than two months after the accident – even though SE could not have

failed conservative treatment less than two months after the purported automobile accident.

(xvii) On April 18, 2019, an Insured named TT was involved in an automobile accident. Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, and Tort-Saade purported to provide multiple facet injections to TT at Florida Spine-Hialeah on June 17, 2019 – less than two months after the accident – even though TT could not have failed conservative treatment less than two months after the purported automobile accident.

(xviii) On April 23, 2019, an Insured named LB was involved in an automobile accident. Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit purported to provide an epidural injection to LB at Florida Spine-Coral Springs on May 23, 2019 – less than two months after the accident – even though LB could not have failed conservative treatment less than two months after the purported automobile accident. Then, six days after that, on May 29, 2019, Florida Spine, TCFII, Feder, Fulcher, Brockelman, and Warheit purported to provide an additional epidural injection to LB at Florida Spine-Coral Springs.

(xix) On June 11, 2019, an Insured named CS was involved in an automobile accident. Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, and Tort-Saade purported to provide an epidural injection to CS at Florida Spine-Hialeah on August 7, 2019 – less than two months after the accident – even though CS could not have failed conservative treatment less than two months after the purported automobile accident.

(xx) On June 13, 2019, an Insured named JB was involved in an automobile accident. Florida Spine, TCFII, Feder, Fulcher, Brockelman, Rivera, and Hess purported to provide an epidural injection to JB at Florida Spine-Lake Worth on July 18, 2019 – less than two months after the accident – even though JB could not have failed conservative treatment less than two months after the purported automobile accident.

(xxi) On June 20, 2019, an Insured named LA was involved in an automobile accident. Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit purported to provide an epidural injection to LA at Florida Spine-Coral Springs on July 26, 2019 – less than two months after the accident – even though LA could not have failed conservative treatment less than two months after the purported automobile accident.

(xxii) On June 24, 2019, an Insured named BM was involved in an automobile accident. Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit purported to provide an epidural injection to BM at Florida Spine-Coral Springs on August 20, 2019 – less than two months after the accident – even though BM could not have failed conservative treatment less than two months after the purported automobile accident.

(xxiii)   On July 12, 2019, an Insured named AM was involved in an automobile accident. Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, and Tort-Saade purported to provide multiple facet injections to AM at Florida Spine-Hialeah on August 26, 2019 – less than two months after the accident – even though AM could not have failed conservative treatment less than two months after the purported automobile accident.

(xxiv)   On August 9, 2019, an Insured named MD was involved in an automobile accident. Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit purported to provide an epidural injection to MD at Florida Spine-Coral Springs on September 24, 2019 – less than two months after the accident – even though MD could not have failed conservative treatment less than two months after the purported automobile accident. Then, two weeks after that, on October 7, 2019, Florida Spine, TCFII, Feder, Fulcher, Brockelman, Warheit, and Hess purported to provide an additional epidural injection to MD at Florida Spine-Lake Worth.

(xxv)   On August 29, 2019, an Insured named BW was involved in an automobile accident. Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, and Warheit purported to provide an epidural injection to BW at Florida Spine-Coral Springs on October 8, 2019 – less than two months after the accident – even though BW could not have failed conservative treatment less than two months after the purported automobile accident.

334.    These are only representative examples. In the claims for pain management injections identified in Exhibit "1", Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Rivera, Warheit, Greenberg, and Tort-Saade routinely purported to provide medically unnecessary pain management injections to Insureds before the Insureds could have tried and failed any course of legitimate, conservative treatment, in order to maximize the potential charges that they could submit, and cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

## 5.    The Fraudulent Charges for Services That Never Were Performed in the First Instance

335.    Not only did the Defendants falsely represent that Florida Spine was eligible to collect PIP Benefits, when in fact it never was eligible to collect PIP Benefits because it was operated in violation of the operating requirements set forth in the Clinic Act, and not only did the

Defendants misrepresent the nature, extent, and reimbursability of the Fraudulent Services, but they also routinely billed GEICO for services that they never provided in the first instance.

336.    Numerous Insureds have provided sworn testimony to the effect that they never received the services that were billed to GEICO through Florida Spine.

337.    For example:

(i)      During an examination under oath on January 11, 2019, an Insured named JD gave testimony indicating that he never received any hot/cold pack treatments at Florida Spine-Pompano. Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit billed GEICO $1,740.00 for twenty nine hot/cold pack treatments they falsely purported to provide to JD.

(ii)     During an examination under oath on January 24, 2019 an Insured named DF gave testimony indicating that he never received any ultrasound treatment and therapeutic activity treatments at Florida Spine-West Dade. Even so, Florida Spine, Feder, Hess, Amar, Tort-Saade, and other providers associated with Florida Spine billed GEICO $220.00 for four ultrasound treatments they falsely purported to provide to DF, and $450.00 for five therapeutic activity treatments they falsely purported to provide to DF.

(iii)    During an examination under oath on January 25, 2019, an Insured named RH gave testimony indicating that she never received any neuromuscular reeducation at Florida Spine-North Miami. Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, Sanon, and Tort-Saade billed GEICO $2,618.00 for thirty four neuromuscular reeducation treatments they falsely purported to provide to RH.

(iv)     During an examination under oath on January 22, 2019, an Insured named SB gave testimony indicating that she never received any neuromuscular reeducation at Florida Spine-North Miami. Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, White, Sanon, Tort-Saade, and other providers associated with Florida Spine billed GEICO $2,233.00 for twenty nine neuromuscular reeducation treatments they falsely purported to provide to SB.

(v)      During an examination under oath on March 5, 2019, an Insured named SJ gave testimony indicating that she never received any neuromuscular reeducation at Florida Spine-Kendall. Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, other providers associated with Florida Spine, and Greenberg billed GEICO $2,751.00 for thirty-five neuromuscular reeducation treatments they falsely purported to provide to SJ.

(vi)     During an examination under oath on March 13, 2019, an Insured named RP gave testimony indicating that she never received any neuromuscular reeducation at

Florida Spine-Kendall. Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Amar, other providers associated with Florida Spine, and Greenberg billed GEICO $2,079.00 for twenty seven neuromuscular reeducation treatments they falsely purported to provide to RP.

(vii)    During an examination under oath on May 8, 2019, an Insured named SJ gave testimony indicating that she never received any neuromuscular reeducation at Florida Spine-North Miami. Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Sanon, and Tort-Saade billed GEICO $1,596.00 for nineteen neuromuscular reeducation treatments they falsely purported to provide to SJ.

(viii)   During an examination under oath on May 30, 2019, an Insured named AG gave testimony indicating that she never received any ultrasound treatment at Florida Spine-Pompano. Even so, Florida Spine, TCFII, Feder, Hess, Fulcher, Brockelman, Englander, and Warheit billed GEICO $96.00 for two ultrasound treatments they falsely purported to provide to AG.

338.    In the claims identified in Exhibit "1", numerous Insureds provided sworn statements to insurance investigators to the effect that they had not received services that had been billed through Florida Spine to GEICO.

### III.    The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO

339.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA-1500 forms and treatment reports through Florida Spine to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

340.    The claims that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following, material respects:

(i)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that Florida Spine was in compliance with the Clinic Act and therefore was eligible to collect PIP Benefits in the first instance. In fact, the Florida Spine clinics never were in compliance with the Clinic Act, and never were eligible to collect PIP Benefits, because they were operated without legitimate medical directors who legitimately fulfilled the statutory requirements applicable to clinic medical directors.

(ii)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement, because: (a) they were medically unnecessary and provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and (b) in the case of the physical therapy services, because they were often provided by unsupervised massage therapists in contravention of Florida law.

(iii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

## IV.     The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

341.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO

342.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants have systemically concealed their fraud and have gone to great lengths to accomplish this concealment.

343.    For instance, the Defendants knowingly misrepresented and concealed facts related to the Clinic Defendants in an effort to prevent discovery that the Florida Spine clinics lacked legitimate medical directors, and therefore were ineligible to collect PIP Benefits in the first instance.

344.     What is more, the Defendants knowingly misrepresented and concealed facts related to the Fraudulent Services in an effort to prevent discovery that the Fraudulent Services were being provided – to the extent that they were provided at all – in many instance by unsupervised massage therapists in contravention of Florida law.

345.     Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to them.

346.     Moreover, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were performed in the first instance.

347.     The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

348.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $2,000,000.00.

349.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against Florida Spine**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

350.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 349 above.

351.     There is an actual case in controversy between GEICO and Florida Spine regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

352.     Florida Spine has no right to receive payment for any pending bills submitted to GEICO because the Florida Spine clinics unlawfully were operated in violation of the Clinic Act's medical director and operating requirements.

353.     Florida Spine has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

354.     Florida Spine has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not performed by individuals who actually were licensed to perform the pertinent services, or else constituted non-reimbursable massage.

355.     Florida Spine has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent

protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

356.    Florida Spine has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

357.    Florida Spine has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

358.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Florida Spine has no right to receive payment for any pending bills submitted to GEICO.

### SECOND CAUSE OF ACTION
**Against TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, and Tort-Saade**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

359.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 349 above.

360.    Florida Spine is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

361.    TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, and Tort-Saade knowingly have conducted and/or participated, directly or indirectly, in the conduct of Florida Spine's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over one year seeking payments that Florida Spine was not eligible to receive under the No-Fault Law

because: (i) Florida Spine unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Florida Spine Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

362.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

363.    Florida Spine's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, and Tort-Saade operated Florida Spine, inasmuch as Florida Spine was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Florida Spine to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Florida Spine Defendants continue to attempt collection on the fraudulent billing submitted through Florida Spine to the present day.

364.    Florida Spine is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These

inherently unlawful acts are taken by Florida Spine in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

365.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,000,000.00 pursuant to the fraudulent bills submitted through the Florida Spine enterprise.

366.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Amar, Crocco, Danieli, Englander, Layton, Lopez, Sanon, and White**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

367.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 349, above.

368.     Florida Spine is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

369.     TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Amar, Crocco, Danieli, Englander, Layton, Lopez, Sanon, and White are or were employed by or associated with the Florida Spine enterprise.

370.     TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Amar, Crocco, Danieli, Englander, Layton, Lopez, Sanon, and White  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Florida Spine's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over

one year seeking payments that Florida Spine was not eligible to receive under the No-Fault Law because: (i) Florida Spine unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

371.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

372.    TCFII, Feder, Fulcher, Brockelman, Hess, Greenberg, Warheit, Tort-Saade, Rivera, Amar, Crocco, Danieli, Englander, Layton, Lopez, Sanon, and White knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

373.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,000,000.00 pursuant to the fraudulent bills submitted through the Florida Spine enterprise.

374.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against All Defendants**
**(Under Fla. Stat. 501.201 et. seq.)**

375.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 349 above.

376.     The Defendants are actively engaged in trade and commerce in the State of Florida.

377.     GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

378.     The Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

379.     The bills and supporting documents submitted or caused to be submitted by the Florida Spine Defendants to GEICO were fraudulent in that they misrepresented: (i) Florida Spine's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

380.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Defendants has been materially injurious to GEICO and its Insureds.

381.     The conduct of the Defendants was the actual and proximate cause of the damages sustained by GEICO.

382.     The Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $2,000,000.00.

383.     By reason of the Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

### FIFTH CAUSE OF ACTION
**Against TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Amar, Crocco, Danieli, Englander, Layton, Lopez, Sanon, and White (Under Fla. Stat. 772.103 et. seq.)**

384.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 349 above.

385.     In furtherance of the fraudulent scheme, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Amar, Crocco, Danieli, Englander, Layton, Lopez, Sanon, and White submitted or caused to be submitted thousands of fraudulent charges through the Florida Spine enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

386.     When the billing was submitted, TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Amar, Crocco, Danieli, Englander, Layton, Lopez, Sanon, and White knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Florida Spine unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the

Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

387.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

388.    This pattern of criminal activity resulted in TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Amar, Crocco, Danieli, Englander, Layton, Lopez, Sanon, and White receiving more than $2,000,000.00 in PIP Benefits to which they were not entitled.

389.    TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Amar, Crocco, Danieli, Englander, Layton, Lopez, Sanon, and White's pattern of criminal activity has caused GEICO to sustain damages of at least $2,000,000.00.

390.    By reason of TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Amar, Crocco, Danieli, Englander, Layton, Lopez, Sanon, and White's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

## SIXTH CAUSE OF ACTION
### Against All Defendants
### (Common Law Fraud)

391.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 349 above.

392.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Florida Spine for the Fraudulent Services.

393.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Florida Spine was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Florida Spine never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

394.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Florida Spine that were not reimbursable.

395.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,000,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Defendants through Florida Spine.

396.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

397.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### Against All Defendants
### (Unjust Enrichment)

398.     GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1 through 349 above.

399.     As set forth above, the e Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

400.     When GEICO paid the bills and charges submitted or caused to be submitted by the Defendants through Florida Spine, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

401.     The Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

402.     The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

403.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $2,000,000.00.

## JURY DEMAND

404.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against Florida Spine, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Florida Spine has no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of Action against TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, and Tort-Saade, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Amar, Crocco, Danieli, Englander, Layton, Lopez, Sanon, and White, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against all Defendants, compensatory damages in an amount to be determined at trial but in excess of $2,000,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

E.      On the Fifth Cause of Action against TCFII, Feder, Hess, Fulcher, Brockelman, Warheit, Greenberg, Tort-Saade, Rivera, Amar, Crocco, Danieli, Englander, Layton, Lopez, Sanon, and White, compensatory damages in an amount to be determined at trial but in excess of $2,000,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

      F.      On the Sixth Cause of Action against all Defendants, compensatory damages in an amount to be determined at trial but in excess of $2,000,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

      G.      On the Seventh Cause of Action against all Defendants, more than $2,000,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:      April 6, 2020

*/s/ John P. Marino*
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen L. Wenger (FBN 92136)
SMITH, GAMBRELL & RUSSELL, LLP
50 North Laura Street
Suite 2600
Jacksonville, Florida 32202
Phone:  (904) 598-6100
Facsimile:  (904) 598-6204
jmarino@sgrlaw.com
ltrowell@sgrlaw.com
kwenger@sgrlaw.com

Barry I. Levy (pro hac vice pending)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11550
Phone:  (516) 357-3000
Facsimile:  (516) 357-3333
barry.levy@rivkin.com
*Attorneys for Plaintiffs*

*Attorneys for Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co.*